Leslye KNOX, individually, as personal representative of the Estate of Aharon Ellis and as natural guardian of plaintiffs Jordan Terrell Ellis, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavyah Carter and Amitai Carter, Jordan Terrell Ellis, minor, Reuven Carter, minor, Shanon Carter, minor, Shayrah Carter, minor, Amitai Carter, minor, by their next friend and guardian Leslye Knox, Prince Shaleak, Mellonee Ellis, Francine Ellis, Lynne Ellis, Yihonadav Ellis, Tsaphrirah Ellis and Aron Carter, Plaintiffs,

v.

The PALESTINE LIBERATION ORGANIZATION, the Palestinian Authority (aka "The Palestinian Interim Self–Government Authority" and/or "The Palestinian Council" and/or "The Palestinian National Authority"), Yasser Arafat, Marwan Barghouti, Nasser Awis, Ziad Muhammad Daas, Estate of Abdel Salam Sadek Hassuna, deceased and John Does 1–99, Defendants.

No. 03 Civ. 4466.

United States District Court, S.D. New York.

March 1, 2004.

**426**

David J. Strachman, McIntyre, Tate, Lynch & Holt, L.L.P., Providence, RI, for Plaintiffs.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs, the representative and heirs and survivors of the Estate of Aharon Ellis ("Ellis") (collectively "Plaintiffs") commenced this action asserting claims arising under the Antiterrorism Act of 1990, 18 U.S.C. 2331 *et seq.* (the "ATA"), and other related common law tort causes of action. They allege that Ellis was murdered in a terrorist attack that occurred in Israel in January 2002 and that the shooting was planned and carried out by defendant Abdel Salam Sadek Hassuna ("Hassuna") acting in concert with and under the direction and assistance of the Palestinian Liberation Organization ("PLO"), the Palestinian

Authority ("PA"), Yasser Arafat ("Arafat"), chairman of the PLO and leader of the PA, as well as numerous other named and unnamed individual defendants (collectively "Defendants"). Before the Court is Defendants' motion pursuant to Fed. R.Civ.P. 12(b) to dismiss the complaint asserting lack of subject matter jurisdiction and non-justiciability.[1] For the reasons discussed below, Defendants' motion is denied.

## I. BACKGROUND[2]

### A. FACTS AND ISSUES PRESENTED

On the night of January 17, 2002, Ellis, an American citizen then 31 years old, was performing as a singer before approximately 180 relatives and guests celebrating the Bat Mitzvah of twelve-year-old Nina Kardoshova ("Nina") at the David's Palace banquet hall in Hadera, Israel. At approximately 10:45 p.m., random violence struck. While Nina, her family and guests were dancing, Hassuna, a named defendant in this case though now deceased,[3] arrived at the banquet hall, burst through the door and, using a machine gun, opened fire into the crowd of celebrants. Six people were killed in the attack, including Ellis, and over 30 were wounded. And so, a moment of terror supplanted symbolism with reality; what began as an initiation ended in fatality. For Ellis and the other victims, a rite meant to commemorate an early passage into life was turned, instead, into a bloody ritual vainly exalting death.

Plaintiffs seek damages from Defendants, claiming that Hassana and the other

---

1. Defendants also seek to dismiss on the ground that this Court lacks personal jurisdiction over them. To address this defense, the Court must first resolve certain outstanding issues related to the appropriateness and scope of jurisdictional discovery Plaintiffs have demanded. Upon a determination of those matters, the Court will turn to the question of personal jurisdiction in a separate Decision and Order.

2. The factual recitation set forth below is taken from the complaint ("Compl.") filed in this action. As appropriate, the Court also refers to documents submitted by both parties in connection with the instant motion.

3. The complaint does not specify the circumstances of Hassuna's death.

individually named and unnamed defendants were employees, agents and/or co-conspirators of the PLO and PA and, as such, planned and carried out the attack acting in concert with or under instructions or inducements or with the assistance or material support and resources provided by the PLO the PA, Arafat and the other individual defendants.

The issues the parties' arguments and rebuttals present to the Court, however, far transcend the tragedy that ended Ellis's life and the compensation his heirs seek from Defendants. As framed in its larger dimensions, the dispute the parties portray implicates several other far-reaching questions. Is Palestine a state? Is the Israeli military occupation of Palestinian territories an illegal hostile act under international law, or a reality that bears on the validity of Palestine's claim to statehood? Are the PLO and PA constituted governmental entities of a state of Palestine entitled to sovereign immunity, or incubators and agents of international terrorism? Was the violent attack underlying this action carried out with the active knowledge, assistance or participation of Arafat and other high ranking PLO and PA officials? Are Defendants entitled to claim any form of state or governmental immunity to shield them from any further inquiry here into Plaintiffs' allegations? Does this Court possess authority to exercise jurisdiction over the subject matter or over any individual Defendants to permit discovery and further consideration of the merits of Plaintiffs' claims?

Some of these issues are relevant to the matter before the Court. Others decidedly are not germane, even though interjected by the parties, and serve at least to provide some context and "atmospherics" that in some respects inform the actual controversy before the Court. Thus, the first challenge the Court addresses below is how to parse which issues are and are not properly here for adjudication.

## B. CHARGES AND COUNTERCHARGES

The action at bar is actually one of several recent cases[4] commenced in United States courts against the PLO and PA and their officials by American citizens who reside or were visiting in Israel or in Palestinian territories over which the PLO and PA exercise some measure of governmental authority pursuant to certain underlying agreements detailed below. Plaintiffs in these cases, individually or in a representative capacity, assert claims for personal injuries arising from the crossfire of violence that has occurred during the longstanding conflict in that region of the world. As confirmed in the instant litigation, the plaintiffs and defendants in the various actions, each side represented by the same attorneys, spar over the same fundamental issues, which are articulated at two levels. Juridically, the plaintiffs assert claims of "international terrorism" pursuant to ATA § 2333. In turn, the defendants, invoking sovereign state immunity for the PLO and PA as governmental entities of Palestine, counter with a challenge to the court's subject matter jurisdiction, a question that has not been definitively decided in any of the prior actions,[5] and so is presented here anew.

---

4. *See, e.g., Ungar v. Palestinian Authority ("Ungar I")*, 228 F.Supp.2d 40 (D.R.I.2002), aff'd, *Ungar v. Palestinian Liberation Org. ("Ungar II")*, 2003 WL 21254790 (1st Cir. May 27, 2003); *Shartsky v. Syrian Arab Republic*, No. 02 Civ. 2280 (D.D.C.Nov. 18, 2002); *Gilmore v. Palestinian Interim Self-Government Authority*, No. 01 Civ. 853 (D.D.C. April 18, 2001); *Biton Palestinian Interim Self–Government Authority*, No. 01 Civ. 382 (D.D.C.) (filed Feb. 20, 2001).

5. In *Ungar II*, the First Circuit summarily affirmed, without prejudice to another motion

But, somewhat overshadowing their weighty legal disputes, the parties in all of these cases also collide politically. Each side effectively accuses the other of misusing the judicial forum as a platform to advance its larger political agenda. In fact, on the basis of the record before it, the Court finds some truth to those accusations. A fair reading of the complaint and the papers and arguments presented in connection with this motion, and the related issues raised in the companion cases, reveals clear parallels between the legal skirmishes waged here and the epic struggles, portrayed in similarly charged rhetoric, over which the antagonists to the Israeli–Palestinian conflict have clashed through the years, on the ground in Israel and the Palestinian territories, and in countless international arenas.

Thus, Plaintiffs assert in this action that the PLO and the PA are terrorist entities that from their inception – the PLO in the 1960s and the PA in 1994 – to the present, have carried out terrorist attacks as an established and systematic policy and practice and as a means of achieving their political goals. (*See* Compl. ¶ 17–18.) To these ends, according to Plaintiffs, the PLO and the PA have "planned and carried out terrorist bombings and shootings" in which hundreds of innocent civilians have been murdered or wounded, including dozens of American citizens. (*Id.*) Plaintiffs lay culpability for these acts of violence and atrocities squarely on the PLO and the PA. Plaintiffs assert that these entities have acted through authorization and instructions of their officials, agents and employees, including Arafat and the other high-ranking PLO and PA officials, and have as a primary purpose "to intimidate and coerce [the Israeli] civilian population into acquiescing to defendants' political goals and demands and to influence the policy of the United States and Israeli governments in favor of defendants' political goals and demands." (*Id.* ¶ 31.)

For their part, Defendants dismiss Plaintiffs' "extreme partisan allegations of terrorism" as a political attack on the PLO and the PA expressing "political animus against Palestine and its leadership" in general terms "similar to many statements of Prime Minister [Ariel] Sharon and the combative and hostile actions of his government...." (*See* Memorandum of Points and Authorities By Defendants PLO and PA in Support of Their Motion Pursuant to Fed.R.Civ.P. 12(b) To Dismiss The Complaint, dated November 6, 2003 ("Def.Mem."), at 24–25.) According to Defendants, the charges Plaintiffs level here not only render the case non-justiciable, but illustrate "the danger it poses to the peace process." (*Id.* at 24.) In asserting immunity allegedly grounded on the sovereignty of the "State of Palestine under international law" (Def. Mem. at 13), Defendants claim that the PLO and PA constitute core elements and functions of the government of Palestine and are thus entitled to the same immunity as Palestine. (*See id.* at 16.) They characterize Israel's military occupation of and settlements in Palestinian territories as being "illegal" and violations the Fourth Geneva Convention (*Id.* at 27), and portray the occupation as constituting "oppressive measures against the Palestinian people and government," including "use of excessive military force ... resulting in death and injury and destruction of property." (*Id.* at 13–14.) Defendants also point to the "constant suffering by the Palestinian people which has

---

properly and timely filed, the District Court's ruling rejecting Defendant challenge to the Court's personal jurisdiction and claim of sovereign immunity under FSIA § 1604 and ATA § 2337(2) and took "no view as to the merits of that defense." 2003 WL 21254790, at *1. Defendants later filed such a motion, which awaits decision by the District Court.

produced a continuing humanitarian crisis and anger and violence and support for violence that would not otherwise exist." (*Id.* at 13–14.) And they decry Palestine's often being "coerced into acceptance of conditions it opposes or would reject, many exacted by Israel in violation of international law...." (*Id.* at 15.)

The Court delves in such detail into these contentions at this point not to lend them undue legitimacy in the dispute at hand but, quite to the contrary, merely to cite them as exemplars of what is and is not properly and realistically before the Court in this lawsuit. By disposing of the collateral diversions early on, the Court hopes to narrow the inquiry and the parties' focus as the litigation progresses to the precise questions to be adjudicated here: whether these Plaintiffs have a cognizable and valid cause of action against any or all of these Defendants arising out of the tragedy that occurred at David's Palace in Hadera, Israel on the night of January 17, 2002.

The parties actually do agree, albeit tacitly, on a point that their polemics then proceed to ignore: that this litigation cannot serve to transform this Court into another public platform used for the parties to reenact struggles over what, at bottom, present ancillary political issues, intractable questions that are neither before the Court in the legal dispute at hand, nor are readily susceptible of judicial resolution. Consistent with this observation, Plaintiffs will not emerge from this proceeding with a judgment that, as Defendants frame the issue, "adjudicate[s] history in progress" (Def. Mem. at 27) and:

> [a]ssesses the Palestinian–Israeli conflict over the years in order to adopt the complaint's political and prejudiced view that all the violence in the region and beyond was by the PLO and PA and was pure terrorism, instigated, conducted and orchestrated by them and that they bear sole responsibility for all violent acts alleged to have been committed by Palestinians anywhere over the past three decades or more.

(*Id.* at 26.)

By the same token, for the reasons elaborated below, neither are Defendants to obtain, through the back channel of a judicial ruling by this Court, what has eluded them so far from national and international discourse in the political and diplomatic arenas: a declaration of illegality of the Israeli occupation of the Palestinian territories, and a constitutive statement by a branch of the United States government acknowledging or expressing recognition that Palestine is a state.

That said, the Court is mindful that, enveloped beneath and through the smoke generated by the parties' adjunct rhetorical fray, there are issues that have tangential bearing on the Court's determination of the motion at hand: for example, whether, given the character and scope of Israel's occupation of the Palestinian territories and of Israel's relationship with the PLO, the PA and Palestinian leaders – as described by Defendants themselves and supported by the rebuttal documents upon which Plaintiffs rely – Defendants' claim of sovereign immunity deriving from the alleged statehood of Palestine can reasonably be validated for the purposes of defeating the application of the ATA in this case. On this point, this Court finds the record before it ample enough to warrant a conclusion that Defendants' invocation of immunity must fail on two separate grounds.

First, the Court is not persuaded that Defendants have compellingly established that Palestine is a state as defined by the governing standard applicable here: that articulated in § 201 of the Restatement (Third) of the Foreign Relations Law of the United States (the "Restatement (Third)") (1987). For, in the final analy-

sis, Defendants' claim of statehood for Palestine reduces to an intense, enduring aspiration that, however devoutly wished, apparently still seems more boosted by impassioned protestations and pretensions than affirmed by the juridically recognized ensigns of a sovereign nation. Second, whatever the status of Palestine in the view of other countries, even if it were widely considered an independent state elsewhere, Palestine is not a foreign entity politically recognized by the United States, and therefore, is not one entitled in our courts to be accorded all the privileges and immunities of sovereign states to which this country, acting through the executive branch, does confer formal recognition.

## II. DISCUSSION

### A. STATEHOOD UNDER THE RESTATEMENT

#### 1. Sovereign Immunity in General

The relevant civil remedies provision of the ATA provides that any United States national (or his heirs) may recover treble damages against those who cause him injury through acts of international terrorism. See 18 U.S.C. § 2333. A 1992 amendment to the ATA bars any actions under that provision as against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency

thereof acting within his or her official capacity or under color of legal authority." 18 U.S.C. § 2337. More broadly, the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq., deprives federal courts of jurisdiction over any "foreign state" in any civil action, subject to exceptions not relevant here. See 28 U.S.C. § 1604; see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (holding that "the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country"); Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 532 (5th Cir.1992).

The PLO and PA assert that they are part of the "foreign state" of Palestine. Thus, they assert that the FSIA deprives this Court of jurisdiction to hear any aspect of this case and that § 2337 exempts them from the ATA cause of action in particular. As an initial matter, the Court makes clear that these two inquiries are identical, for purposes of this motion. There is no indication that the term "foreign state" means something different in Title 18 of the United States Code than in Title 28. In fact, the legislative history of the 1992 ATA amendment indicates that it was intended merely to *clarify* that ordinary principles of sovereign immunity, as codified by FSIA, would apply to foreign states and their instrumentalities.[6] Thus

---

6. *See A Bill to Provide a New Civil Cause of Action in Federal Law for International Terrorism that Provides Extraterritorial Jurisdiction Over Terrorist Acts Abroad Against United States Nationals: Hearing on s. 2465 Before Senate Subcomm. on Courts and Administrative Practice of the Comm. on the Judiciary,* S. Hrg. 101–1193, 101st Cong. 18 (July 25, 1990) (testimony of Alan Kreczo, Deputy Legal Advisor, Department of State) ("This provision would state that the Bill's other provisions shall *not* apply in suits against ... foreign states as defined in the Foreign Sovereign Immunities Act, or any officer or employee thereof. The effect of this provision would be to maintain the sta-

tus quo as regards sovereign states and their officials: no cause of action for 'international terrorism' exists against them.") (emphasis in original).

Defendants make the untenable argument that the ATA's foreign state exemption should be read more broadly than the FSIA's foreign state immunity because the ATA, unlike the FSIA, exempts foreign officials even when they are not acting in their official capacities. First, Defendants have apparently misread the ATA, which only exempts a foreign official who is "acting within his or her official capacity or under color of legal authority." 18 U.S.C.A. § 2337; *cf. Jungquist v. Sheikh Sul-*

the Court addresses the question of sovereign immunity without differentiating ATA and FSIA principles.

The Court must therefore determine whether there exists a "foreign state" of Palestine and, if so, whether the the PLO and PA are essential elements of that state. Defendants need not demonstrate that either the PLO or PA would, by itself, satisfy the criteria for statehood. *See Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 153 (D.C.Cir.1994) (holding that "the core functions of the armed forces ... are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself"). The Court concludes that PLO and PA are not entitled to sovereign immunity because there does not exist a state of Palestine which meets the legal criteria for statehood applicable to the Court's adjudication of the issue.

### 2. *Brief Legal History of the PLO and PA*

Although the Court will not endeavor to craft an impartial and comprehensive history of the struggle between the Palestinians and the Israelis over control of the territory historically known as Palestine,[7] a brief mention of the events of legal significance to the motion now before the Court is instructive. At the end of World War I, the League of Nations placed Palestine (until then part of the Ottoman Empire) under British control, or "mandate," for the purpose of eventually establishing an independent state. *See Convention Between the United States and Great Britain in Respect to Rights in Palestine,* Dec. 23, 1924, U.S.-Br., 44 Stat. 2184. From then and especially through and immediately following World War II, many Jews immigrated to the region, in spite of strong opposition from the local Arab inhabitants.[8] Violence between Arabs and Jews prompted Great Britain to call for a special session of the United Nations General Assembly.[9] In November 1947, the General Assembly adopted Resolution 181(II), which called for Palestine to be partitioned into a Jewish state and an Arab state, and contemplated that each state would gradually gain independence. *See* Future Government of Palestine, G.A. Res. 181(II), U.N. GAOR, Supp. No. 1, at 131, UN Doc. A/519 (1947). Resolution 181(II) engendered more violent conflict because leaders of the Palestinians rejected it, while Jewish leaders accepted it.[10] When British forces pulled out of the region in May 1948, Jewish leaders proclaimed the establishment of Israel, along the borders called for under Resolution 181(II), and full-blown war erupted between Israel and various neighboring Arab states.[11] Israel prevailed and controlled much of the terri-

---

*tan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1027 (D.C.Cir.1997) (holding the FSIA only provides immunity to a foreign state official acting in his or her official capacity). Second, the issue of official versus unofficial capacity is of no moment to the more fundamental question raised here: whether there exists a sovereign state of Palestine. In other words, even assuming the ATA were more expansive than the FSIA in protecting foreign state officials from suit, that fact would have no bearing on whether any purported foreign official is actually an official of an entity qualifying as a foreign state in the first place.

**7.** Here and elsewhere, the Court uses the term "Palestine" to refer to the Palestinian territory, not to the state of "Palestine," whose legal existence is precisely the issue raised by this motion.

**8.** *See* United Nations, *The Question of Palestine & The United Nations* 3 (2003), *available at* http://www.un.org/Depts/dpi/palestine/.

**9.** *Id.*

**10.** *Id.* at 10–11.

**11.** *Id.* at 11–13.

tory which had been allotted to the contemplated Arab state by Resolution 181(II), while Egypt and Jordan controlled the remaining portions – the Gaza Strip and the West Bank of the Jordan River (the "West Bank"), respectively.[12] The war caused almost 750,000 Palestinians to become refugees.[13]

Israel was admitted to the United Nations in 1949, *see* G.A. Res. 273, U.N. GAOR, 3d Sess., Supp. No. 2, at 18, U.N. Doc. A/RES/273 (III) (1949), and the situation in the region remained relatively without outbreak of major conflict until June 1967, when Israel, attacked by some of its Arab neighbors (Egypt, Jordan, and Syria), became involved in what became known as the Six–Day War.[14] Israel again prevailed, and gained control of all of Palestine, including the West Bank, the Gaza Strip, and East Jerusalem – the areas which are now collectively called "Palestine," or the "occupied Palestinian territories."[15] In November 1967, the United Nations Security Council adopted a resolution calling for "[w]ithdrawal of Israel armed forces from territories occupied in the recent conflict" and emphasized the need for "acknowledgment of the sovereignty, territorial integrity and political independence of every State in the area...." S.C. Res. 242, U.N. SCOR, 22d Sess., 1382d mtg., U.N. Doc. S/INF (1967).

The PLO, which had formed in 1964, established a new charter in 1968 calling for the continued fight for Palestinian rights and independence.[16] In 1974, the United Nations General Assembly recognized the PLO as "the principal party to the question of Palestine," and the PLO has since participated in the United Nations General Assembly as a permanent observer. *See* G.A. Res. 3210 and 3237, U.N. GAOR, 29th Sess., Supp. No. 31, at 4, U.N. Doc. A/9631 (1974). Neither the PLO nor Palestine has been admitted as a full member of the United Nations.

In 1988, the Palestinian National Council, the self-described Parliament in exile of the Palestinian people, issued a "Declaration of Independence" which purported to establish an independent state of Palestine, with Jerusalem as its capital.[17] Within days, more than two dozen countries, including the Soviet Union and India, issued statements supporting the declaration or recognizing the new Palestinian state. *See* David Remnick, *Soviets Endorse Palestinian Declaration; Statement Appears Short Of Diplomatic Recognition,* Wash. Post, Nov. 19, 1988, at A19; *see also* Philip Taubman, N.Y. Times, *Moscow Lauds P.L.O. State But Is Vague on Recognition,* Nov. 19, 1988, at A4. The United States did not endorse the declaration, nor did it recognize a Palestinian state. *Id.* Against this backdrop, a Second Circuit panel held in 1991 that the PLO was not a "foreign state" and therefore not entitled to sovereign immunity under the FSIA. *See Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 47–49 (2d Cir.1991). That panel held it "quite clear" that the PLO met *none* of the four legal prerequisites for statehood enunciated in the Restatement (Third). *Id.* at 47. Nonetheless, Defendants contend that several fundamental international developments which occurred after *Klinghoffer* was decided produced agreements between the Palestinians and the Israelis and actual changes in Palestine that have materially altered the situation on the ground and cast doubt on the continuing validity of *Klinghoffer.*

12. *Id.* at 12.

13. *Id.*

14. *Id.* at 18.

15. *Id.*

16. *Id.* at 31.

17. *Id.* at 32.

Specifically, in September 1993, the PLO achieved a major milestone on the road towards a Palestinian state when, in a ceremony on the White House lawn, it agreed with the government of Israel to a Declaration of Principles on Interim Self–Government Arrangements (the "DOP"). *See* Thomas L. Friedman, *Rabin and Arafat Seal Their Accord as Clinton Applauds 'Brave Gamble,'* N.Y. Times, Sept. 14, 1993, at A1. The DOP "recognized [the] mutual legitimate and political rights" of the Palestinians and Israelis and sought to move the two sides towards a "just, lasting and comprehensive peace settlement. . . ." Declaration of Principles on Interim Self–Government Arrangements, Sept. 13, 1993, Preamble, 32 I.L.M. 1525, 1527 ("DOP"). In broad terms, the DOP established a five-year framework and timetable by which the two sides would negotiate the details for Israel to gradually transfer political and administrative authority in the West Bank and Gaza Strip to the Palestinians. *Id.*

The DOP specified that, upon Israel's withdrawal of forces from the Gaza Strip and Jericho, the Palestinians would immediately establish a police force and would have immediate authority over "education and culture, health, social welfare, direct taxation, and tourism" in Palestine. *Id.* art. VI, at 1530. The two sides agreed to begin negotiating an "Interim Agreement" which would, among other things, specify the structure of an interim Palestinian governmental authority and detail the transfer of powers from the Israeli government to that new Palestinian governmental authority. *Id.* art. VII, at 1530–31. The DOP also called for the parties to begin "permanent status negotiations" to resolve the tougher questions of "Jerusalem, refugees, settlements, security arrangements,

borders, relations and cooperation with other neighbors, and other issues of common interest." *Id.* art. V, at 1528–29.

In May 1994 one of many agreements augmenting the DOP established the interim governmental authority – the PA – with "all the legislative and executive powers and responsibilities" specified in that agreement. *See* Israel–Palestine Liberation Organization Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, arts. III(1) and IV(1), 33 I.L.M. 622, 627–28. The DOP and such accompanying agreements are often collectively called the "Oslo Accords."

In September 1995, the parties completed the Interim Agreement. *See* Israel–Palestine Liberation Organization: Interim Agreement on the West Bank and the Gaza Strip, Sept. 28, 1995, 36 I.L.M. 551 ("Interim Agreement"). The Interim Agreement is far more comprehensive than the DOP and established in far greater detail the rights and obligations of the parties. It overhauled the structure of the PA and delineated its powers in much more detail.[18] *Id.* arts. I–IX, at 558–62. The Interim Agreement also provided for various security arrangements, including the redeployment of certain Israeli forces in the West Bank. *Id.* arts. X–XIV, 561–63. As the constitutional document defining the PA and its official powers and functions, the Interim Agreement is crucial in answering the legal questions raised in this motion.

### 3. *Palestine's Claim To Statehood*

■ As an initial matter, neither the DOP, the Interim Agreement, nor any other of the Oslo Accords purports to create a state of Palestine. The Interim Agreement explicitly states that the "status" of the occupied Palestinian territories "will be

---

18. The Interim Agreement actually calls the overhauled PA the "Palestinian Council." For simplicity's sake, the Court will refer to both bodies as the PA. The complaint names the PA as a defendant, but states that the PA is also known as the Palestinian Council.

preserved during the interim period." *See id.,* art. XXI(8), at 568. A logical inference from these facts, and from the title of the Interim Agreement as "Interim," is that the Oslo Accords aim towards *eventual* statehood for Palestine (or some other permanent arrangement), not that the Oslo Accords have already created an independent state of Palestine. A close examination of the details of those agreements confirms this inference because, as the Court here stresses, the Oslo Accords consciously apportion political, administrative and diplomatic authority as between Israel and Palestine so as to make it clear that, under the relevant and well-established legal test, there does not exist, at present, an independent sovereign state of Palestine.

The Second Circuit has adopted the Restatement (Third)'s definition of "state" for purposes of the FSIA. *See Klinghoffer,* 937 F.2d at 47; *accord Kadic v. Karadzic,* 70 F.3d 232, 244 (2d Cir.1995). Accordingly, for these purposes, "a state is an entity that has [1] a defined territory and a[2] permanent population, [3] under the control of its own government, and that [4] engages in, or has the capacity to engage in, formal relations with other such entities." Restatement (Third) § 201. The PLO and PA do not meet, nor are they part of any entity which meets, these criteria because, first, the PLO and PA do not sufficiently "control" Palestine and, second, they do not have sufficient capacity to engage in foreign relations.

Defendants argue that, at least since the United Nations called for a partition of British-mandated Palestine, Palestine has had a defined territory. While acknowledging that the borders have occasionally changed and that there is some dispute as to their exact contours, Defendants main-

tain that it is commonly recognized that Palestine today consists of the West Bank, Gaza Strip, and East Jerusalem. Moreover, Defendants remind the Court of what is an indisputable historical fact: that there has been a permanent population in Palestine for over two millennia.

Plaintiffs' briefing purports to challenge these first two requirements, but their arguments in this regard are, in essence, that neither the PLO nor PA has a defined territory *under its control,* nor a permanent population *under its control.* Accordingly, the Court moves directly to the third prong of the Restatement (Third) definition and addresses whether there is a government in Palestine in control of a defined territory and permanent population.

#### 4. *Control Over Territory And Population*

■ As evidence that the purported government of Palestine is in control of its population in the defined territory, Defendants assert that Palestinian government officials provide the complete services of a government, limited only to the extent that Israel forcibly imposes its occupation upon the Palestinians. Defendants emphasize that Israel's occupation – which Defendants contend is violent, oppressive, and illegal – cannot negate Palestine's claim to statehood. Defendants also direct the Court's attention to a law review article which concludes that "Palestine has a plausible claim to statehood. . . ." *See* John Quigley, *The Israel–PLO Interim Agreements: Are They Treaties?,* 30 Cornell Int'l L.J. 717 (1997). In that article, Professor Quigley argues that under the Interim Agreement, "the PLO came to administer both the Gaza Strip and the major towns of the West Bank,"[19] and thereby arguably satisfied the Restatement (Third)'s control requirement. *Id.* at 724.

---

**19.** Plaintiffs make the well-founded criticism that Professor Quigley has failed to make the important distinction between the PLO, the party to the Oslo Accords, and the PA, the

interim governmental authority created by the Oslo Accords. To the extent any Palestinian entity governs Palestine, it is the PA, not the

Moreover, Professor Quigley asserts that "the control requirement has been relaxed in international practice where the putative state was seen to have a right to statehood and where there was not a competing entity seeking statehood in the same territory." *Id.* He cites the examples of the Congo and Guinea–Bissau, which were admitted to the United Nations, even though their previous colonizers (Belgium and Portugal, respectively) had not yet fully ceded control to the new nations. *Id.* at 724–25. On this point, the Court disagrees with the Defendants and Professor Quigley and is persuaded instead by the weight of judicial and scholarly authority pronouncing that, for statehood purposes, the PA and PLO do not meet the control requirement.

It is well-accepted under international law that, to meet the governmental control requirement, the entity "must be capable of acting independently of foreign governments." IV *Encyclopedia of Public International Law* 603 (Rudolf Bernhardt ed., 1st ed.2000). In other words, the entity must be "independent from direct orders from other State powers." *Id.*[20] The purported state must have "legal authority which is not in law dependent on any other earthly authority." 1 *Oppenheims's International Law*, 122 (Robert Jennings & Arthur Watts eds., 9th ed.1992); *see also* Ian Brownlie *Principles of Public Interna-*

*tional Law* 72 (1998) ("[T]he state must be independent of other state legal orders. . . .").

For example, a 1991 Second Circuit panel held that Palau, a group of approximately 200 islands in the Southwest Pacific, was not a foreign state within the meaning of the FSIA because the United States retained "ultimate authority over the governance of Palau." *Morgan Guar. Trust Co. of New York v. Republic of Palau*, 924 F.2d 1237, 1245 (2d Cir.1991). In this regard, following World War II, the United States entered into a Trusteeship Agreement with the United Nations Security Council regarding the governance of more than 2,100 islands (including Palau) formerly governed by Japanese mandate. *Id.* at 1238–39. Even though Palau "ha[d] been exercising sovereign powers pursuant to its Constitution adopted in January, 1981," *Morgan Guar. Trust Co. of New York v. Republic of Palau*, 639 F.Supp. 706, 716 (S.D.N.Y.1986), the Second Circuit panel held that it was not entitled to sovereign immunity because, among other reasons, Palau was bound by pertinent United States laws, including executive orders of the Secretary of the Interior. 924 F.2d at 1245. The panel noted "that a political entity whose laws may be suspended by another cannot be said to be possessed of sovereignty of any kind, de facto or de jure." *Id.*[21]

PLO, and the contours of its governmental control and functions reach only as far as the scope of authority Israel has consented to cede to the PA. Accordingly, the PLO, by itself, would clearly not satisfy the control requirement. *Cf. Klinghoffer*, 937 F.2d at 48 ("[E]ven accepting the PLO's contention that the State of Palestine incorporates the West Bank, the Gaza Strip, and East Jerusalem, those areas are all under the control of the State of Israel, not the PLO.").

**20.** The commentary in the *Encyclopedia of International Law* is based upon the definition of "state" from the Montevideo Convention

on the Rights and Duties of States, Dec. 26, 1933, 49 Stat 3097, T.S. No. 881, 165 L.N.T.S. 19. The Restatement notes that its definition is "nearly identical" to that of the Montevideo Convention. *See* Restatement (Third) § 201 cmt. a.

**21.** In *Palau*, the Second Circuit used the term "sovereignty" as an indicator of statehood. The term "sovereignty" is "much abused," *see* Restatement (Third) § 206 cmt. b; *see also* James Crawford *The Creation of States in International Law* 26 (1979) (noting the "long and troubled history" of the term), as it can refer to an *indicator*, or criterion,

An examination of the Interim Agreement confirms that the Oslo Accords have not created a Palestinian state because the Interim Agreement substantially circumscribes the PA's authority in many spheres of governance. The first words of Article I of the Interim Agreement make clear that the PA has limited jurisdiction: "Israel shall transfer powers and responsibilities as specified in this Agreement from the Israeli military government and its Civil Administration to the [PA] in accordance with this Agreement. *Israel shall continue to exercise powers and responsibilities not so transferred.*" *See* Interim Agreement, art. I, 36 I.L.M. at 558 (emphasis added). In addition to Israel's Article I residual authority, the Interim Agreement is explicit that Israel, not the PA, has authority and jurisdiction regarding Israeli settlements, external security, and the Palestinian airspace. *See id.* art. XII(2)(a), at 564 (settlements); *id.* art. X, at 561 (external security); *id.* art. XVII(2) and Annex I, art. XIII(4), at 564, 586 (airspace). Moreover, the PA has virtually no jurisdiction over Israeli citizens, even when they are otherwise within the PA's territorial jurisdiction. *See id.* art. XVII(2)(c), at 564 ("The territorial and functional jurisdiction of the Council will apply to all persons, except for Israelis, unless otherwise provided in this Agreement."); *id.*, Annex I, art. XI(4)(d), at 585 ("Israelis shall under no circumstances be apprehended or placed in custody or prison by Palestinian authorities."); *id.* Annex IV, art. I(2)(b), at 635 ("Israel has sole criminal jurisdiction over . . . offenses committed in the Territory by Israelis."); *id.* Annex IV, art. III(2), at 638 (describing limited civil jurisdiction where an Israeli is a party). Israel has authority to approve or reject visitors' permits to the West Bank and Gaza, and to approve or reject persons seeking permanent residence there. *See id.* Annex III, Appendix 1, art. 28(11)-(14), at 617. Under the Interim Agreement, a committee with an equal number of Israelis and Palestinians is in charge of "matters arising with regard to infrastructures, such as roads, water, and sewage systems, power lines and telecommunications infrastructure, which require coordination" between the parties. *Id.* Annex III, art. I(1) and (4), at 603.

of statehood, or an *incident* of statehood. *Compare* Brownlie, *supra,* at 76 ("The term 'sovereignty' may be used as a synonym for independence, an important element of statehood. . . ."), IV *Encyclopedia of Public International Law, supra,* at 603 ("[A] government exists only if the governed State remains a *sovereign* entity in so far as it is independent from direct orders from other State powers.") (emphasis added), *and* 1 *Oppenheims's International Law, supra,* at 120–23 (stating that a *sovereign* government is one of four criteria for statehood) *with* Restatement (Third) § 206 cmt. b (stating that sovereignty is a "capacit[y]" or "right[]" of states) *and* Crawford, *supra,* 71 at ("[I]t seems preferable to restrict . . . 'sovereignty' to the legal incident."). The former meaning denotes "independence," *see* Brownlie, *supra,* at 76, while the latter meaning is "the competence that States *prima facie* possess." Crawford, *supra,* at 71. Even though the Restatement does not formally mention "sovereignty" as a criterion of statehood under § 201, one meaning of that term – "independence" – is instructive to two of the § 201 issues in this case: whether Defendants control a populace and whether they have the capacity to enter into foreign relations. In other words, certain infringements upon a purported state's sovereignty, or independence, are evidence that the purported state does not control its populace. Similarly, where an outside entity has foreign relations authority with respect to a purported state, the purported state is not "independent," or sovereign. The *Palau* court apparently intended the term "sovereignty" in this sense. Because, just as in *Palau,* the question of statehood (as opposed to its consequences) is at issue in this case, the Court uses "sovereignty," and cites sources which employ that term, in the sense of "independence."

In short, the PA's authority is subordinate to Israel's sovereign control, in many fundamental ways that conflict with and negate a claim of the existence of independent statehood for the Palestinian territory over which the PA exercises the limited governmental power specified in the Oslo Accords. Other authorities agree with this conclusion. Professor Geoffrey Watson, enumerating many of the limitations upon the PA's authority mentioned above, concluded: "These examples raise continued doubt about any claim that the PA satisfies the requirement that a state be in 'control' of its territory." Geoffrey R. Watson, *The Oslo Accords, International Law and the Israeli–Palestinian Peace Agreements*, 70 (2000). Professor Watson also directly addresses Professor Quigley's argument, which Defendants incorporate into their briefing, that the "control" requirement has relaxed in recent years, as evidenced by the cases of the Congo and Guinea–Bissau:

> In both those cases Belgium and Portugal had already agreed to recognize the new states before withdrawing their troops. That is not the case here. Israel has repeatedly made clear that it does not recognize any Palestinian state, at least not yet. As we have seen, Israel's view on this point is reflected in the Oslo Accords, which pointedly stop short of referring to a Palestinian state.

*Id.* Another commentator agreed that the PA "does not possess sovereignty over [Palestine] in any practical sense" because "Israel retains authority to review all legislation governing the administration of the territories, it has personal jurisdiction over all Israelis in the territories, it exercises control over most aspects of economic development and security in the territories, and it continues to regulate movement between the Palestinian administrative enclaves." *See* Omar M. Dajani, *Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period*, 26 Denv. J. Int'l L. & Pol'y 27, 84 (1997); *see also* George E. Bisharat, *Peace and the Political Imperative of Legal Reform in Palestine*, 31 Case W. Res. J. Int'l Law 253, 260 (1999) ("Clearly neither Oslo I nor Oslo II awarded sovereignty over the West Bank and Gaza Strip to the Palestinians.").

Defendants do not dispute any of these limitations on the PA's control, except to point out that they are the result of Israel's illegal and oppressive occupation. It is true that "belligerent occupation does not affect the continuity of the state." Crawford, *supra*, at 407; *see also* Restatement (Third) § 201 Rptrs. n. 3 ("Military occupation, whether during war or after an armistice, does not terminate statehood, *e.g.*, Germany's occupation of European states during World War II, or the allies' occupation of Germany and Japan after the war."); Brownlie, *supra*, at 78 ("[I]llegal occupation cannot itself terminate statehood."); Malcolm N. Shaw, *International Law* 144–45 (1991) (stating that a state's extinction "will not happen in international law as a result of the illegal use of force" and citing the example of Iraq's invasion of Kuwait in 1990). However, the predicate for this principle is that a sovereign entity satisfying all of the prerequisites for statehood existed prior to the occupation. In this case, Defendants have not argued that there was an independent state of Palestine immediately *before* Israel's allegedly illegal occupation. Under international law, a state will *maintain* its statehood during a belligerent occupation, *see id.*, but it would be anomalous indeed to hold that a state may *achieve* sufficient independence and statehood in the first instance while subject to and laboring under the hostile military occupation of a separate sovereign. In light of the preceding discussion, the Court concludes that neither the PLO nor PA possesses sufficient control over the disputed Palestinian

territories to satisfy the "control" criterion of statehood.

### 5. *Capacity To Conduct Foreign Relations*

■ "An entity is not a state unless it has competence, within its own constitutional system, to conduct international relations with other states, as well as the political, technical, and financial capabilities to do so." Restatement (Third) § 201 cmt. e. The capacity of a state to engage in foreign relations with other sovereigns depends, in part, "on the entity concerned being separate for the purpose of [international] relations so that no other entity both carries out and accepts responsibility for them." Crawford, *supra*, at 47. Under the Interim Agreement, the PA is expressly prohibited from conducting foreign relations:

> In accordance with the DOP, the [PA] will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.

Interim Agreement, art. IX, 36 I.L.M at 561. As Professor Watson explains, "The Interim Agreement starkly forbids the PA to engage in even the most fundamental aspect of foreign relations, [which] is obviously inconsistent with the suggestion that the PA now has the 'capacity to engage in foreign relations.'" Watson, *supra*, at 71; *see also* Dajani, *supra*, at 87 ("Palestine, as a national and territorial unit, does not have the capacity to engage independently in international relations."); Justus R. Weiner, *Hard Facts Meet Soft Law – The Israel–PLO Declaration of Principles and the Prospects for Peace: A Response to Katherine W. Meighan*, 35 Va. J. Int'l L.

931, 942 (1995) ("By virtue of the [Interim] Agreement the Council clearly lacks the capacity to enter into relations with other states, an essential prerequisite for independence under international law.") (footnotes omitted).

The Interim Agreement permits the PLO to negotiate and enter into international agreements regarding certain economic development plans, as well as certain cultural, scientific and educational agreements, "for the benefit of" the PA. *See* Interim Agreement, art. IX(b), 36 I.L.M. at 561. However, the Interim Agreement explicitly declares that these limited activities "shall not be considered foreign relations." *Id.* More importantly, the Interim Agreement provides no mechanism by which the PLO could actually implement any international commitments in the spheres of power delegated to the PA. *See* Dajani, *supra*, at 87 ("[The PLO] cannot translate international commitments affecting the territory or population of Palestine into PA policies without first obtaining Israel's consent."); *cf. Klinghoffer*, 937 F.2d at 48 ("[T]he PLO lacks the ability to actually implement the obligations that normally accompany formal participation in the international community."). Furthermore, neither the PLO nor the PA would be able to implement any international commitments in the spheres of authority which, as discussed above, remain with Israel, such as those relating to external threats, border control, and the movement of persons into the Palestinian territories. For this independent reason, Defendants have failed to carry their burden to demonstrate that the PLO or PA, even in combination, have sufficient capacity to conduct international relations to satisfy that criterion of statehood.

### B. *UNRECOGNIZED STATE*

■ Even assuming for the sake of argument that, as Defendants contend, there

exists a sovereign "State of Palestine under international law" (Def. Mem. at 13), it does not follow that Defendants are entitled to the immunity they seek from the exercise of this Court's subject matter jurisdiction. Defendants have presented no evidence, and the Court is not aware of any, establishing that Palestine, whatever its status in other jurisdictions, has been recognized, or otherwise treated as a sovereign state, by the United States. Nor is there any indication that the United States has conferred upon the PLO and PA recognition as official representatives of the government of the purported Palestinian state, thereby entitling them to assert the privileges and immunities ordinarily accorded to specified officials and agents of sovereign entities. These circumstances thus raise a question concerning the extent to which this Court is bound to give effect to Defendants' invocation of foreign state immunity of a purported unrecognized state.

In *Kadic*, the Second Circuit observed that "[r]ecognized states enjoy certain privileges and immunities relevant to judicial proceedings," such as access to United States courts and head-of-state immunity. 70 F.3d at 244 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 408–12, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) and *Lafontant v. Aristide*, 844 F.Supp. 128, 131 (E.D.N.Y.1994)). The Circuit Court also noted, however, that "an unrecognized state is not a juridical nullity" and that "[o]ur courts have regularly given effect to the 'state' action of unrecognized states." *Id.*

The scope of whatever effect United States courts give to the state actions or privileges and immunities of an unrecognized state is a matter ultimately determined not by juridical right or rule of law, but by whether, by application of the doctrine of comity or as a matter of public policy, it is warranted for a court, under the circumstances of a particular case, to accord any measure of respect to the asserted acts or protections of the foreign entity or government in question. The Supreme Court has defined international comity as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of [its] or citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Elaborating on several prerequisites to be considered in applying comity to an action or decision of a foreign government, the Second Circuit required among them a showing that "the laws and public policy of the forum state and the rights of its residents will not be violated." *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir.1985).

But comity developed as a principle generally applicable to certain interactions between sovereign states and governments that maintain some relations. "[C]omity is often associated with the existence of friendly relations between states...." *Sabbatino*, 376 U.S. at 409, 84 S.Ct. 923; *Russian Socialist Federated Soviet Republic v. Cibrario*, 235 N.Y. 255, 139 N.E. 259, 260 (1923) (noting that comity "presupposes friendship"). Thus, the degree of friendliness that characterizes the relations between particular states and that typically is embodied in the act of mutual recognition, ordinarily defines the types of sovereign acts and the range of privileges and immunities to which comity may be conferred in judicial proceedings in this country. Conversely, as the Supreme Court observed in *Sabbatio*: "[T]he refusal to recognize has a unique legal aspect. It signifies this country's unwillingness to acknowledge that the Government in question speaks ... for the territory it pur-

ports to control." 376 U.S. at 410, 84 S.Ct. 923 (citations omitted).

Moreover, because comity is often a function of recognition, matters concerning who is recognized as the sovereign or government of a particular territory, and whether and to what extent comity is accorded to its acts and officials, are political questions uniquely within the domain and prerogatives of the executive branch. Thus comity "may ... not be demanded as a right. It is yielded as a favor." *Cibrario,* 139 N.E. at 260. Most significant for the purposes of the inquiry now before the Court, " '[i]t is not the comity of the Courts, but the comity of the nation which is administered, and ascertained in the same way....' " *Bank of Augusta v. Earle,* 38 U.S. (13 Pet.) 519, 589, 10 L.Ed. 274 (1839) (quoting Joseph Story, *Conflict of Laws* 37 (1834)); *Guaranty Trust,* 58 S.Ct. at 791 ("What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government."); *see also Sabbatino,* 376 U.S. at 410, 84 S.Ct. 923 (noting that "[p]olitical recognition is exclusively a function of the Executive" and that the Court "would hardly be competent to undertake assessments of varying degrees of friendliness or its absence"); *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 319–20, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (noting that in the realm of external relations "the President alone has the power to speak or listen as a representative of the nation" and to determine when, how and upon what subjects to negotiate with foreign states); *National Petrochemical Co. v. M/T Stolt Sheaf,* 860 F.2d 551, 555 (2d Cir.1988).

Recognition of a foreign entity of a sovereign state, or of a regime as the government of a state, may be effectuated by express declaration of the executive branch, by bilateral agreement with the foreign state, by the presentation of credentials by the United States to the authorities of the state and by the United States receiving the credentials of the diplomatic representatives of the foreign state. *See KMW Int'l v. Chase Manh. Bank, N.A.,* 606 F.2d 10, 17 n. 5 (2d Cir. 1979); Restatement (Third) § 204 Rptrs. n. 2. Recognition may also be found to be implied, for example, through a vote by the United States to admit a foreign entity to membership in an international body open only to sovereign states. *See id.; see also id.* at § 201 cmt. h. While recognition is a matter of which courts may take judicial notice, *see KMW Int'l,* 606 F.2d at 17 n. 5 (citing *United States v. Belmont,* 301 U.S. 324, 330, 57 S.Ct. 758, 81 L.Ed. 1134 (1937)), the "possible incongruity of judicial 'recognition'," *Sabbatino,* 376 U.S. at 410–11, 84 S.Ct. 923, would constitute an unwarranted arrogation of power. This constraint on judicial authority is especially compelling because the political discretion to recognize foreign states and governments carries with it "the power to determine the policy which is to govern the question of recognition." *United States v. Pink,* 315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796 (1942). Hence, "recognition is not always absolute; it is sometimes conditional." *Id.* Accordingly, the manner, means and timing that define the terms of any such conditions of recognition of a purported sovereign or its representatives are matters clearly beyond the realm of judicial competence.

By the same token, the effects of political nonrecognition are whatever the states involved intend the consequences to be. *See, e.g., Latvian State Cargo & Passenger S.S. Line v. McGrath,* 188 F.2d 1000, 1003 (D.C.Cir.1951); *The Maret,* 145 F.2d 431, 442 (3d Cir.1944); *Transportes Aereos de Angola v. Ronair, Inc.,* 544 F.Supp. 858, 863–64 (D.Del.1982); *Bank of China v.*

*Wells Fargo Bank & Union Trust Co.*, 104 F.Supp. 59, 64 (N.D.Cal.1952), *rev'd on other grounds*, 209 F.2d 467 (9th Cir.1953); *see generally* Crawford, *supra*, at 120–21. In addressing claims of sovereign or governmental immunity or disputes concerning the legitimacy of the actions of unrecognized foreign states, courts have taken divergent approaches. Some have enunciated as a categorical rule that "[i]n the absence of recognition no comity exists." *Cibrario*, 139 N.E. at 262 (holding that a government not recognized by the United States is not entitled to bring suit in courts in this country); *see also Guaranty Trust Co.*, 304 U.S. at 137, 58 S.Ct. 785 ("It is not denied that, in conformity to generally accepted principles, the Soviet Government could not maintain a suit in our courts before its recognition by the political department of the government."); *The Maret*, 145 F.2d at 442 ("When the fact of nonrecognition of a foreign sovereign and nonrecognition of its decrees by our Executive is demonstrated ... the courts of this country may not examine the effect of decrees of the unrecognized foreign sovereign and determine rights in property ... upon the basis of these decrees."); *The Gul Djemal*, 296 F. 563, 564 (S.D.N.Y. 1920), *aff'd*, 264 U.S. 90, 95, 44 S.Ct. 244, 68 L.Ed. 574 (1924); Restatement (Third) § 204; *see generally* Stanley Lubman, *The Unrecognized Government in American Courts:* Upright v. Mercury Business Machines, 62 Col. L.Rev. 275 (1962); Edwin M. Borchard, *The Unrecognized Government in American Courts*, 26 Am. J. Int'l L. 261 (1932).

This proposition is grounded on the premise that actual recognition serves as a prerequisite for a United States court to exercise jurisdiction over a claim concerning the existence of a foreign state or the legitimacy of an act of such a state. Thus, following this course, the executive branch's decision to withhold or reject recognition would be dispositive of the judicial proceeding; regardless of the nature of the dispute, the court would not venture beyond the status of the foreign entity as an unrecognized state. In *Republic of China v. Merchants' Fire Assur. Corp.*, for example, a suit commenced by a foreign government prior to its recognition by the United States was dismissed and later ordered reinstated when recognition was conferred while the case was pending at the Court of Appeals. 30 F.2d 278, 279 (9th Cir.1929). In reversing the judgment of dismissal, the Ninth Circuit stated: "[I]nasmuch as there had been no such recognition of the National Government of China at the time of the trial in the court below, it would seem to follow that that government had no existence in contemplation of law and no legal capacity to sue in the courts of this country." *Id.; The Maret*, 145 F.2d at 442; *see also Russian Reinsurance Co. v. Stoddard*, 240 N.Y. 149, 147 N.E. 703, 705 (1925) (noting that in considering claims arising out of the actions of unrecognized states, "[u]ntil the State Department has recognized the new establishment, the court may not pass upon the [foreign state's] legitimacy or ascribe to its decrees all the effect which inheres in the laws or orders of a sovereign"); *Sokoloff v. National City Bank*, 239 N.Y. 158, 145 N.E. 917, 918 (1024) ("Juridically, a government that is unrecognized may be viewed as no government at all, if the power withholding recognition chooses thus to view it.").

More specifically, according to this doctrine, nonrecognition may result in denial of access to courts in this country. *See Pfizer Inc. v. India*, 434 U.S. 308, 319–20, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978) ("It has long been established that only governments recognized by the United States and at peace with us are entitled to access to our courts, and that it is within the exclusive power of the Executive Branch to determine which nations are entitled to

sue."); *Guaranty Trust Co.*, 304 U.S. at 137, 58 S.Ct. 785; *Federal Republic of Germany v. Elicofon*, 358 F.Supp. 747, 752 (E.D.N.Y.1970). Similarly, recognition may be decisive in determining entitlement to property of the foreign entity in the United States. *See Republic of Panama v. Republic Nat'l Bank of New York*, 681 F.Supp. 1066, 1070 (S.D.N.Y.1988) (rejecting a claim to funds in a bank account of a foreign state whose regime the United States did not recognize as the country's legitimate government); *see also The Maret*, 145 F.2d at 442. The extent to which other privileges and immunities traditionally associated with national sovereignty are conferred may also turn directly on recognition. *See, e.g., United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir.1984) (noting that the assertion of diplomatic and sovereign immunity is precluded where there is no recognition of the purported foreign state); *see also The Gul Djemal*, 296 F. at 564; *Cibrario*, 139 N.E. at 262; Restatement (Third) § 205.

Under another approach, other courts have not been beholden solely to the status of nonrecognition and, without relying only on the executive branch's ultimate determination in that regard, have not categorically nullified the official actions or disregarded the sovereignty claims of unrecognized entities. *See Kadic*, 70 F.3d at 244. Rather, in adjudicating these questions they generally have endeavored to draw certain pragmatic distinctions. First, these courts take cognizance of the difference between recognition of the existence of a particular unrecognized foreign state and the scope of any privileges and immunities that may be conferred upon it in a given case, including the treatment accorded to the purported government and representatives of the entity. Hence, while as a factual and juridical matter an unrecognized foreign entity may satisfy the criteria for statehood under the Restatement (Third)'s definition in a specific judicial proceeding, it does not follow that all of the privileges and immunities that ordinarily accompany sovereign status will necessarily be extended to the entity or its designated rulers. *See, e.g., Kadic*, 70 F.3d at 247–48 (rejecting claims of sovereign and diplomatic immunity asserted by the president of an unrecognized state even though the entity theoretically met the prerequisites of statehood); *Russian Gov't v. Lehigh Valley R.R. Co.*, 293 F. 135, 137 (S.D.N.Y.1923) (acknowledging that Russia as a sovereign state existed and was the real party in interest in the action before the court even if the United States did not recognize Russia's government).

Second, the unrecognized foreign state is accorded *de facto* existence with respect to adjudications of strictly commercial transactions, adjustments of private rights, and effectuation of juridical and ministerial acts properly taken by it within the ambit of its territory incidental to sovereign or governmental functions that are deemed judicially cognizable; however, no such presumptive effect is generally given to circumstances involving political questions that fundamentally implicate the status of the foreign entity in its formal relations with the United States and that thus necessarily demand an expression from the executive branch concerning the United States foreign policy consequences of a legal determination regarding the matter at issue. *See United States v. Insurance Cos.*, 89 U.S. (22 Wall.) 99, 101–03, 22 L.Ed. 816 (1875); *Texas v. White*, 74 U.S. (7 Wall.) 700, 733, 19 L.Ed. 227 (1868); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 699 (2d Cir.1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); *see also Sabbatino*, 376 U.S. at 409–10, 84 S.Ct. 923.

A third approach adopted by the courts in some unrecognized state case is to defer

to an expression of United States foreign policy with regard to the appropriateness of entertaining the assertion of immunity or giving effect to the foreign act in question. *See Sabbatino,* 376 U.S. at 410, 84 S.Ct. 923 (permitting access to United States courts to a foreign entity where the executive had clearly expressed its support for the granting of such privilege); *National Petrochemical,* 860 F.2d at 555 (same); *Lehigh Valley,* 293 F. at 137.

Fourth, in some cases where the executive branch has not interposed any suggestion of foreign policy interest in the prosecution of an action involving an unrecognized state, the courts have exercised jurisdiction to consider the matter if adjudication of the controversy would not violate domestic public policy or otherwise conflict with the interests of justice. *See, e.g., Banque de France v. Equitable Trust Co.,* 33 F.2d 202, 206 (S.D.N.Y.1929) ("Justice requires that effect should be given by our courts, even though we do not recognize the Russian Government, to those acts in Russia upon which the rights of our citizens depend, provided that in doing so our judicial department does not encroach upon or interfere with the political branch of our government."); *Wulfsohn v. Russian Socialist Federated Soviet Republic,* 234 N.Y. 372, 138 N.E. 24, 25–26 (1923), *appeal dismissed,* 266 U.S. 580, 45 S.Ct. 89, 69 L.Ed. 451 (1924) (reversing an exercise of jurisdiction over the nonrecognized government of Soviet Russian Republic where plaintiff had conceded that there was "an existing government, sovereign within its own territories."); *Upright v. Mercury Business Mach. Co.,* 13 A.D.2d 36, 213 N.Y.S.2d 417, 419 (1st Dep't 1961); *cf. Sokoloff,* 145 N.E. at 919 (noting that "a body or group which has vindicated by the course of events its pretensions to sovereign power, but which has forfeited by its conduct the privileges or immunities of sovereignty, may gain for its acts and decrees a validity quasi-gov-

ernmental, if violence to fundamental principles of justice or to our own public policy might otherwise be done")

Whatever doctrinal differences may distinguish the courts' treatment of rights and duties asserted in claims by or against unrecognized states or governments, a reconciling principle may be discerned threading through the various approaches, either expressed or implied, about which there appears to be no judicial dispute. When the executive branch, either by word or deed, does manifest its political determination that the courts' exercise of jurisdiction over a particular matter involving actions or privileges and immunities of unrecognized states or governments would be inimical to United States foreign policy interests or relations with the unrecognized sovereign, or when the court on its own, from demonstrable matters of public record, may readily ascertain such fundamental conflict with public policy were it to give effect to the invocation of sovereign status of the unrecognized state or government, the courts generally accept as conclusive such declared or ascertained expression of United States international relations policy. As the District of Columbia Circuit has remarked:

> [W]hen the executive branch ... has determined upon a foreign policy, which can be and is ascertained, and the non-recognition of specific foreign decrees is deliberate and is shown to be part of that policy, such non-recognition must be given effect by the courts. The rule applicable in such circumstances is the same rule applicable to an act of recognition. Any other treatment of a deliberate policy and act of non-recognition would reduce the effective control over foreign affairs by the executive branch to a mere effectiveness of acts of recognition. The control of the executive branch over foreign affairs must necessarily be broader than that.

*McGrath,* 188 F.2d at 1003; *see also The Maret,* 145 F.2d at 442 ("Nonrecognition of a foreign sovereign ... [is] to be deemed to be as essential a part of the power confided by the Constitution to the Executive for the conduct of foreign affairs as recognition.... A policy of nonrecognition when demonstrated by the Executive must be deemed to be as affirmative and positive in effect as a policy of recognition."); *Ronair,* 544 F.Supp. at 863–64 ("[W]here the executive branch, either by its actions or words, evinces a definite desire to remove the impediment to a suit brought by an unrecognized government, or an instrumentality thereof, that determination necessarily frees this Court from any strictures placed on the exercise of its jurisdiction."); *Bank of China,* 104 F.Supp. at 66 ("It is not a proper function of a domestic court of the United States to attempt to judge which government best represents the interests of the Chinese State in the Bank of China. In this situation, the Court should justly accept, as the representative of the Chinese State, that government which our executive deems best able to further the mutual interests of China and the United States.")

The courts have also declared, in a doctrine especially germane to the issues at hand, that an unrecognized state cannot assert its sovereign status to immunize its acts or its representatives from exercise of "jurisdiction in [actions] alleging violations of basic human rights or international law." *See Kadic,* 70 F.3d at 245 (holding that customary international law of human rights "applies to states without distinction between recognized and unrecognized states"); *Klinghoffer,* 937 F.2d at 49 (noting that "there is no bar to suit where an unrecognized regime is brought into court as a defendant"); *see also* Shaw, *supra,* at 262 ("[A]n unrecognized state must be deemed subject to the rules of international law. It cannot consider itself free from

restraints as to aggressive behaviour....").

In *Kadic,* the Second Circuit found that plaintiffs' allegations concerning the existence of a state of Srpska, a self-proclaimed Bosnian–Serb republic that emerged from the collapse of the former Yugoslavia, were sufficient to satisfy the criteria for a state under international law. The Circuit Court nonetheless allowed plaintiffs' action brought under the Alien Tort Claims Act and the Torture Victim Protection Act to proceed against defendant Radovan Karadzic, president of Srpska, an entity not recognized by the United States even if it may have qualified for treatment as a sovereign under the standard definition of statehood. The Circuit Court rejected Karadzic's various claims of sovereign and diplomatic immunity. *See* 70 F.3d at 247–48. It concluded that, at bottom "[t]he inquiry ... is whether a person purporting to wield official power has exceeded internationally recognized standards of civilized conduct, not whether statehood in all its formal aspects exists." *Id.* at 245.

Applying the preceding principles here, even if Defendants presented sufficient evidence that Palestine and the PA and PLO regime satisfy the criteria for statehood, this Court would decline to give effect to the foreign state and governmental immunities Defendants invoke as a shield from application of the Antiterrorism Act.

First, there is nothing in the ATA or the FSIA to suggest that by carving out a foreign state exclusion from the application of those statutes Congress intended to disturb the traditional rules of comity. In particular, the exceptions do not evince any Congressional purpose to directly confer sovereign privileges and immunities, in matters uniquely fraught with foreign policy implications, upon any unrecognized foreign entity which satisfied the prerequi-

sites of statehood, even before the executive branch had occasion to assess whether or not to extend any degree of comity to the sovereignty claims of such unrecognized state or its government. Because the scope of this country's relations with foreign states is a subject solely within the purview of the executive branch to determine in the first instance, to construe the foreign state exemption of the FSIA and the ATA to effectuate such immunities automatically upon an invocation of sovereignty by any unrecognized state, thereby effectively preempting assessment by the executive branch of the appropriateness of granting such exception as regards particular foreign entities or policy concerns, would necessarily engender potential conflict of constitutional dimension between the powers of Congress and the prerogatives of the president in the sphere of external affairs. *See, e.g., Sabbatino,* 376 U.S. at 410, 84 S.Ct. 923; *Guaranty Trust,* 58 S.Ct. at 791; *Curtiss–Wright,* 299 U.S. at 319–20, 57 S.Ct. 216.

Thus, while Congress could properly legislate to exempt foreign states from the courts' jurisdiction pertaining to specific subject matters, such categorical exclusions must presuppose applicability to sovereign entities that the United States has formally recognized, and thereby presumptively "determine[d] the policy which is to govern the question of recognition," *Pink,* 315 U.S. at 229, 62 S.Ct. 552, including the bounds of the privileges and immunities that the foreign states may properly assert by virtue of comity or international agreements. Otherwise, any jurisdictional bar may apply only to an unrecognized state to which, on an exceptional basis, the executive branch has expressly or implicitly chosen to extend some degree of comity in the form of any of the customary perquisites of sovereignty. *See, e.g., Kadic,* 70 F.3d at 245; *Klinghoffer,* 937 F.2d at 49; *National Petrochemical,* 860 F.2d at 555. Or else, absent such executive branch expression,

the Court could allow the exemption invoked if it determines that honoring the unrecognized foreign state's assertion of sovereignty would not otherwise violate United States public policy and the interests of justice. *See Banque de France,* 33 F.2d at 206; *Sokoloff,* 145 N.E. at 919.

Second, the Court notes, as mentioned above, that the same issue of Palestinian statehood as a basis for immunity of these Defendants from the subject matter jurisdiction of this Court has arisen in several other recent actions pending in other federal courts. There is no indication that the government's executive branch has expressed a view in any of these actions suggesting that Defendants possess any form of immunity from the exercise of the courts' jurisdiction, or that the status of relations between the United States and Defendants would render the prosecution of such litigation in our courts inimical to current United States foreign policy interests, or to this country's relations with Defendants. The Court notes that in other cases where the executive branch has made these assessments as regards unrecognized states, it has taken affirmative steps to convey its position to the courts. *See, e.g., Sabbatino,* 376 U.S. at 410, 84 S.Ct. 923; *National Petrochemical,* 860 F.2d at 555; *Republic of Panama,* 681 F.Supp. at 1069; *Lehigh Valley,* 293 F. at 135.

Absent any contrary formal expression as regards a foreign relations issue of such great moment entailing extensive controversy and public debate as that surrounding United States policy concerning the purported Palestinian state, the Court construes the silence of the executive branch here as manifesting a view that at this time it has no compelling interest in suggesting that there are issues implicating current United States foreign policy as to why this litigation should not proceed in

this Court. On this basis, the Court is not prepared to find sovereign immunity where none may exist. *See Kadic* 70 F.3d at 248 ("[I]t is the duty of the courts, in a matter so intimately associated with our foreign policy ..., not to enlarge an immunity to an extent which the government ... has not seen fit to recognize.") (citing *Mexico v. Hoffman,* 324 U.S. 30, 35, 65 S.Ct. 530, 89 L.Ed. 729 (1945)); Borchard, *supra,* at 264 ("There are occasions when reference to the executive is appropriate, *e.g.,* to determine the real and diplomatic status of a foreign potentate ... claiming jurisdictional immunity as sovereign or public, boundary questions....").

As the parties invoking foreign state immunity, Defendants have the burden of establishing its existence under the FSIA, or, given the conflict with prevailing United States public policy discussed above, of otherwise producing an authoritative expression of the executive branch's view of the protection they seek from the exercise of the Court's jurisdiction in this matter. *See Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 241 (2d Cir. 2002) (noting that under the FSIA a foreign entity asserting immunity must present a prima facie case that it is a foreign sovereign and has the " 'ultimate burden of persuasion' " in establishing its claim of sovereignty) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir.1993)); *accord Ungar II* 2003 WL 21254790, at *1; *International Ins. Co. v. Caja Nacional De Ahorro Y Seguro,* 293 F.3d 392, 397 (7th Cir.2002); *Keller v. Central Bank of Nigeria,* 277 F.3d 811, 815 (6th Cir.2002). Defendants have not met this burden here. Should they do so at any later stage of this litigation, the Court will of course reexamine its ruling in the light of the then controlling circumstances.

Third, even absent any intervention from the executive branch, the Court notes that its granting the immunities De-

fendants seek would in fact conflict with declared United States public policy regarding the Defendants. Though the P.L.O. has declared Palestine's statehood and several other nations have apparently recognized that status, the United States has yet to recognize a Palestinian state. *Cf. Belmont,* 301 U.S. at 330, 57 S.Ct. 758 (noting that courts may take judicial notice of recognition). In fact, it is a matter of public record that the United States affirmatively opposes the notion that a sovereign Palestine presently exists. The Defendants themselves make this point explicit through the affidavit of Nasser Al–Kidwa ("Al–Kidwa"), chief representative of Palestine to the United Nations:

> The chief political consideration blocking U.N. membership for Palestine has been opposition by the United States and Israel.:... The opposition of the U.S. and Israel to such membership is unmistakable and has been shown in many ways including Security Council and General Assembly votes over many years in which matters affecting Palestine were at issue and the United States and Israel have time and again both taken positions opposed to the interests of Palestine in the General Assembly and Security Council. But for this opposition it is my opinion that Palestine would have been accepted long ago as a member of the United Nations.

(Def. Mem. Ex. 2, at 14.)

Nor is this a case in which, by reason of the exigencies of fast-moving events, the United States has refrained from recognition of a Palestinian state pending changes reflecting actual circumstances on the ground. *See, e.g., National Petrochemical,* 860 F.2d at 554. In fact, United States nonrecognition policy in this regard can be ascertained to be longstanding, unambiguous and "deliberate." *McGrath,* 188 F.2d at 1003. At least two examples

confirm this observation and Al–Kidwa's general point that United States policy opposes recognizing a currently-existing state of Palestine. In December 1988, shortly after the Palestinian National Council's "Declaration of Independence," the United Nations General Assembly voted that "the designation 'Palestine' should be used in place of the designation 'Palestine Liberation Organization' in the United Nations system." G.A. Res. 177, U.N. GAOR, 43rd Sess., Supp. No. 49, at 62, U.N. Doc. A/RES/43/177 (1988). Only the United States and Israel voted against the resolution. *See id; see also* Paul Lewis, *Talking With the P.L.O.; U.N. Ends Its Session in Geneva, Approving 2 Mideast Resolutions,* N.Y. Times, Dec. 16, 1988, at A15. In July 1998, the United Nations General Assembly voted to confer certain additional United Nations privileges to the observer mission of Palestine, effectively granting it "super-observer" status. *See* G.A. Res. 250, U.N. GAOR, 52nd Sess., Supp. No. 49, at 4, U.N. Doc. A/RES/52/250 (1998); Barbara Crossette, *Palestinians' U.N. Role Widened; A U.S. 'No' Vote Is Overwhelmed,* N.Y. Times, July 8, 1998, at A1. The United States was among only four countries voting against the resolution. *See id.*

Moreover, under the Anti–Terrorism Act of 1987, Congress "determine[d] that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law," *See* 22 U.S.C. §§ 5201(b), 5202. It remains presently against United States law to receive or spend PLO funds for the purpose of furthering PLO interests. *See id.; see also Mendelsohn v. Meese,* 695 F.Supp. 1474 (S.D.N.Y.1988) (upholding constitutionality of 22 U.S.C. § 5202).

As discussed above, in determining questions of international comity inherent in the issue of sovereign immunity, courts must be mindful that their decisions not conflict with the laws and express public policies of the United States and that the rights of its residents are not violated. *See Cunard,* 773 F.2d at 457. The executive branch, not the judiciary, is uniquely empowered to delineate the bounds of international comity. In this connection, Defendants cannot escape a reality that compels this Court's assessment of their assertion of jurisdictional immunity. The United States has not recognized their declaration of statehood for Palestine or their claim that they constitute the legitimate "government … [that] speaks as the sovereign authority for the territory it purports to control." *Sabbatino,* 376 U.S. at 410, 84 S.Ct. 923. Nor has this country defined, in any authoritative way called to the attention of this Court, "the policy which is to govern the question of [such] recognition." *Pink,* 315 U.S. at 229, 62 S.Ct. 552.

A ruling by this Court construing the foreign state exception in the FSIA and ATA as giving warrant to Defendants' claims of jurisdictional immunity on the basis of Defendants' own assertion that they represent the sovereign nation and government of a purported state of Palestine would essentially imply a judicial validation of Defendants' claim of legitimacy as the sovereign and representatives of the people they purport to govern, and that Defendants are thus entitled to be accorded in this country legal privileges and protections that derive solely by virtue of the factual existence of that alleged sovereignty – the very assertion of legitimacy that United States foreign policy has deliberately denied or withheld. Consequently, such a ruling not only would have constitutive effect imbued with domestic legal consequences, but run directly counter to the executive branch's declared public policy of nonrecognition of Palestine and the PLO. *See The Maret,* 145 F.2d at 442 ("A policy

of nonrecognition when demonstrated by the Executive must be deemed as affirmative and positive in effect as a policy of recognition."). Thus, the application of the statutes that Defendants seek would serve to create potential congressional and judicial encroachments upon the president's unique powers in the domain of external affairs. *See Ronair*, 544 F.Supp. at 862; *Elicofon*, 358 F.Supp. at 752. For, to indirectly invest the PLO and PA, before the executive branch has formally articulated relevant foreign policies, with the mantle of sovereignty and its concomitant privilege of immunity from the jurisdiction of this Court, may be deemed tantamount to an incongruous act of "judicial 'recognition'" of a government not recognized by the United States. *Sabbatino*, 376 U.S. at 410, 84 S.Ct. 923; *see also National Petrochemical*, 860 F.2d at 554–55 ("The power to deal with foreign nations outside the bounds of formal recognition is essential to a president's implied power to maintain international relations.").

## C. *NON–JUSTICIABILITY*

■ Defendants urge the Court to dismiss the case on the ground that it raises non-justiciable political questions. Specifically, Defendants assert that this case will require the Court to "assess[ ] the Palestinian–Israeli conflict over the years" and to "adjudicate history in progress." (Def. Mem. at 26–27.) The Court disagrees. As explained more fully above, the Court will not, and need not, endeavor to answer or otherwise lend its views towards these broader and intractable political questions which form the backdrop to this lawsuit. This lawsuit will simply adjudicate whether and to what extent the Plaintiffs may recover against Defendants under certain causes of action for the violence that occurred in Hadera, Israel on the night of January 17, 2002.

In this connection, the Court cannot ignore the incongruity and conflict with statutory intent that the Defendants' argument would countenance. Plaintiffs' claims allege unprovoked savagery that encompasses even murder. Defendants' view essentially would ask the Court to hold that, even if the facts were to verify the accusations here, a wanton massacre of innocents would still be "non-justiciable." This proposition cuts against the grain of what compels the business of the courts. It would rub every syllable of justice out of the concept of justiciability and do equal violence to the ATA.

In American jurisprudence, the instances in which atrocities committed against United States nationals are deemed beyond the justiciable reach of the law, and in which our courts are thus utterly unable to perform their ordained functions, are rare indeed. Ordinarily only the intervention of superseding political or juridical constraints would take such grievous wrongs outside the bounds of the courts' remedial arm. The jurisdictional force actuating the ATA aims precisely to further narrow the scant exceptions, so as to extend the law to the vindication of rights and reparation of international injuries that otherwise would not be rectifiable in our courts. In fact, at its core, the statute embodies a precept that goes to the heart of its design, a principle of survival. It manifests that for American victims of international terrorism, finality comes to rest not in violence, but in justice, and that, when all is said and done, the larger and more enduring end lies in the judicial remedy the law uniquely prescribes to survive and redress the terrorist's assault.

The Second Circuit in *Klinghoffer* squarely addressed this issue when the PLO (represented by the same lawyers as in this lawsuit) unsuccessfully sought to dismiss that case on virtually the same grounds. *See* 937 F.2d at 49–50. In *Klinghoffer*, four persons hijacked an Italian cruise liner in the Mediterranean Sea,

and, in the course of the hijacking, an American citizen was thrown overboard and killed. *Id.* at 47. The victim's estate brought common law tort causes of action against various defendants, who impleaded the PLO. *Id.* The PLO unsuccessfully argued that the case raised non-justiciable "foreign policy questions and political questions in a volatile context lacking satisfactory criteria for judicial determination." *Id.* at 49.

First, the Circuit Court emphasized that "the doctrine 'is one of "political questions," not one of "political cases." ' " *Id.* (quoting *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). The "politically charged context" did not convert what was "essentially an ordinary tort suit into a non-justiciable political question." *Id.* Second, the Circuit Court concluded that all six of the considerations put forth in *Baker,* the leading Supreme Court case on the issue, militated *against* applying the political question doctrine. *Id.*[22] Most importantly, *Klinghoffer* noted that common law tort claims are "constitutionally committed" to the judicial branch. *Id.* Moreover, the Circuit Court cited ATA § 2333, under which Plaintiffs have sued in the instant case, and pointed out that Congress had "expressly endorsed" these types of lawsuits. *Id.* at 49–50.

In one of the many similar cases now pending in federal court (all involving the same lawyers), a federal district court in Rhode Island, citing *Klinghoffer,* rejected arguments from the PA and PLO that the case was non-justiciable. *See Ungar I,* 228 F.Supp.2d at 44–47. Defendants here fail

to distinguish (or even cite) *Klinghoffer* or *Ungar I.* Accordingly, the Court concludes that the case will not be dismissed on the alleged ground that it raises non-justiciable political questions.

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion of defendants to dismiss the claims asserted by plaintiffs in this action as against the Palestinian Authority and the Palestine Liberation Organization on the ground that the Court lacks subject matter jurisdiction is DENIED; and it is finally

**ORDERED** that the parties appear at a conference with the Court on March 12, 2004 at 2:30 p.m. to discuss the status of the case and further proceedings in light of this Order.

**SO ORDERED.**

---

**22.** Those considerations are:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertak-

ing independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker,* 369 U.S. at 217, 82 S.Ct. 691.