Leslye KNOX, individually, as personal representative of the Estate of Aharon Ellis and as natural guardian of plaintiffs Jordan Terrell Ellis, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavyah Carter and Amitai Carter, Jordan Terrell Ellis, minor, Reuven Carter, minor, Shanon Carter, minor, Shayrah Carter, minor, Amitai Carter, minor, by their next friend and guardian Leslye Knox, Prince Shaleak, Mellonee Ellis, Francine Ellis, Lynne Ellis, Yihonadav Ellis, Tsaphrirah Ellis and Aron Carter, Plaintiffs,

v.

THE PALESTINE LIBERATION ORGANIZATION, the Palestinian Authority (aka "The Palestinian Interim Self–Government Authority" and/or "The Palestinian Council" and/or "The Palestinian National Authority"), Yasser Arafat, Marwan Barghouti, Nasser Awis, Ziad Muhammad Daas, Estate of Abdel Salam Sadek Hassuna, deceased and John Does 1–99, Defendants.

No. 03 CIV. 4466.

United States District Court, S.D. New York.

July 11, 2006.

David J. Strachman, McIntyre, Tate, Lynch & Holt, Providence, RI, for Plaintiffs.

Ramsey Clark, New York, NY, for Defendant.

### DECISION AND ORDER

MARRERO, District Judge.

### I.  BACKGROUND

By Order dated June 6, 2006, Magistrate Judge Theodore H. Katz, to whom this matter had been referred for pretrial supervision, issued a Report and Recommendation (the "Report"), a copy of which is attached and incorporated herein, recommending that the Court authorize entry of judgment awarding damages to plaintiffs against defendants Palestine Liberation Organization and Palestinian Authority (collectively, "Defendants") in this action in amounts that total $192,740,660.13.[1]  The case was brought pursuant to the Antiterrorism Act of 1991, 18 U.S.C. §§ 2331–2339 D. In prior rulings, this Court found sufficient basis for the exercise of subject matter and personal jurisdiction and authorized entry of a judgment by default establishing Defendants' liability.[2]  Defendants have not filed any objections to the Report, although their time to do so expired on June 21, 2006.  For the reasons stated below, the Court adopts the Report in its entirety.

### II.  STANDARD OF REVIEW

A district court evaluating a Magistrate Judge's report may adopt those portions of the report to which no "specific, written objection" is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous.  See Fed. R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Greene v. WCI Holdings Corp., 956 F.Supp. 509, 513 (S.D.N.Y.1997).  A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. See DeLuca v. Lord, 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); Walker v. Hood, 679 F.Supp. 372, 374 (S.D.N.Y.1988).

### III.  DISCUSSION

The Court finds that the facts set forth in the Report are supported by the record

---

1.  On page 40 of the Report the amount of the total award, by reason of an apparent arithmetic error, is incorrectly given as $174,740,660.13.

2.  The Court's rulings on these issues are reported as Knox v. Palestine Liberation Org., 306 F.Supp.2d 424 (S.D.N.Y.2004) and Knox v. Palestine Liberation Org., 230 F.R.D. 383 (S.D.N.Y.2005).

and are thus incorporated herein by reference. Having conducted a review of the full record, including, among other things, the parties' respective submissions in this action, the Report and applicable legal authorities, the Court finds that the findings, reasoning and legal support for the recommendations made in Report are not clearly erroneous. Accordingly, substantially for the reasons stated therein, the Court adopts the Report in its entirety.

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge Theodore H. Katz dated June 6, 2006 (Docket No. 85) is adopted in its entirety; and it is further hereby

**ORDERED** that the Clerk of Court is directed to enter judgments against defendants Palestine Organization and Palestinian Authority in favor of each of the plaintiffs in the respective amount set forth below:

| | |
|---|---|
| The Estate of Aharon Ellis | $ 5,240,660.13 |
| Leslye Knox | $ 30,000,000.00 |
| Jordan Terrell Ellis | $ 15,000,000.00 |
| Reuven Carter | $ 15,000,000.00 |
| Shanon Carter | $ 15,000,000.00 |
| Shayrah Carter | $ 15,000,000.00 |
| Yoshavyah Carter | $ 15,000,000.00 |
| Amitai Carter | $ 15,000,000.00 |
| Prince Shaleak | $ 15,000,000.00 |
| Mellonee Ellis | $ 15,000,000.00 |
| Francine Ellis | $ 7,500,000.00 |
| Lynne Ellis | $ 7,500,000.00 |
| Yihonaday Ellis | $ 7,500,000.00 |
| Tsaphrirah Ellis | $ 7,500,000.00 |
| Aron Carter | $ 7,500,000.00 |
| TOTAL AWARD | $192,740,660.13 |

The Clerk of Court is directed to close this case.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

KATZ, United States Magistrate Judge.

This action is brought under the Antiterrorism Act of 1991, 18 U.S.C. §§ 2331– 2339D ("the ATA"), by the representatives and heirs of Aharon Ellis, an American citizen who was murdered in a terrorist shooting in Hadera, Israel, on January 17, 2002. Plaintiffs contend that the terrorist attack was planned and carried out by Defendants Palestine Liberation Organization ("PLO") and Palestine Authority ("PA"). Defendants moved to dismiss the action, asserting that (1) the Court lacks subject matter jurisdiction because Defendants are entitled to sovereign immunity, (2) the claims are non-justiciable, and (3) Defendants are not subject to the personal jurisdiction of this Court. The subject matter jurisdiction defenses were rejected, but the District Court (Marrero, J.) deferred ruling on the issue of personal jurisdiction, granting Plaintiffs' request to engage in jurisdictional discovery. See Knox v. Palestine Liberation Org., 306 F.Supp.2d 424, 426 & n. 1 (S.D.N.Y.2004).

The parties' discovery disputes were referred to this Court for resolution. The Court issued repeated Orders requiring Defendants to respond to Plaintiffs' discovery requests, to no avail. Ultimately, after Defendants failed to file an Answer and failed to comply with the Court's discovery Orders, the District Court entered a Default Judgment and referred the action back to this Court for an inquest on damages. See Knox v. Palestine Liberation Org., 230 F.R.D. 383 (S.D.N.Y.2005). An inquest on damages was held on November 8, 2005. Defendants chose not to participate. Many members of Aharon Ellis's family traveled from Israel to testify at the hearing. The Court heard heart-wrenching testimony from Aharon's relatives, as well as a friend whose life Aharon saved. They described Aharon's accomplishments, his deep and inspirational relationships with his relatives and many other people, and the enormous impact of his tragic

death. It is apparent that Aharon Ellis held a special place in the hearts of those who were close to him, as well as the community in which he was raised, as, by all accounts, he was a person who possessed great generosity of spirit, sensitivity, and a maturity beyond his years. It is difficult to communicate on the written page the depth of feeling and utter sense of loss that Aharon's family felt, and continues to feel, four years after his death. His senseless murder left an enormous void in their lives, which the Court cannot adequately describe.

## FINDINGS OF FACT

### Aharon Ellis

Aharon Ellis (hereinafter "Aharon") was born in Israel on December 19, 1970, to his parents Plaintiffs Prince Shaleak and Mellonee Ellis. Aharon was born an American citizen and remained an American citizen until the time of his death.[1] Prior to Aharon's birth, his parents moved from the United States to Israel, to help found a religious community in Israel, on behalf of the African Hebrew Israelites ("AHI"). The members of the AHI reside primarily in a close-knit cooperative community in Dimona, Israel, in the Negev Desert. Aharon Ellis was the first member of the AHI community born in Israel, and he was raised there, along with his siblings—Francine Ellis, Lynne Ellis, Yihonadav Ellis, Tsaphrirah Ellis, and Aron Carter, all of whom are Plaintiffs in this action.

The families in the AHI community live in small apartments, as did the Ellis family, which, in combination with their communal way of life, contributes to intense, close-knit familial and community relationships, where the members care for and support each other. There is a strong emphasis on communal activity, including sports activities, religious and social activities, youth groups, and performing groups.

Aharon was a professional singer, performing mostly in Israel at hotels, family gatherings, clubs, and special events such as bar mitzvahs and weddings. He had also begun to perform in Europe. He was singing at a bar mitzvah at the David's Palace banquet hall in Hadera, Israel, on the day he was murdered. On January 17, 2002, at approximately 10:45 p.m., an agent of the PLO and PA arrived at the banquet hall with an M–16 assault rifle, three clips of bullets, and a hand grenade. The agent shot a security guard at the entrance to the hall, and then entered the hall and opened fire on the crowd. There were approximately 180 people present. Six people were killed and approximately thirty were injured.

At the time of the shooting, Aharon Ellis was on stage with his band. Angela Bangiew, another singer with the band, was also on stage with Aharon, and she testified as to what occurred through a videotaped deposition. (*See* Videotaped Deposition Transcript of Angela Bangiew, dated Nov. 2, 2005 ("Bangiew Dep."), Plaintiffs' ("Pls.") Exhibit ("Ex.") B.) She described how, after he was shot, Aharon grabbed her and pushed her down out of the line of fire. He then lay on top of her to shield her from the bullets. (*See id.* at 10–11.) For three or four minutes Aharon moaned in pain and cried out in English. (*See id.* at 12–13.) He was bleeding, and eventually grew silent and lost consciousness. The medics who arrived at the scene were unable to revive him. Ms. Bangiew credits Aharon with saving her life, and continues to carry a picture of him on her person. (*See id.* at 14.)

Dr. Alan Friedman, a board certified physician in the field of Physical Medicine

1. Similarly, all Plaintiffs in this action were born and remain American citizens.

and Rehabilitation, as well as Internal Medicine, submitted a declaration, which has been admitted in evidence. (*See* Declaration of Dr. Alan Friedman, dated Nov. 7, 2005 ("Friedman Decl."), Pls.' Ex. H.) During his residency training in Rehabilitation Medicine, Dr. Friedman was involved in the evaluation and treatment of trauma victims, including those suffering gunshot and shrapnel wounds, traumatic brain injury, spinal cord injury, and peripheral nerve injuries. (*See id.* ¶ 4.) Dr. Friedman presently divides his professional duties between Barnert Hospital in Patterson, New Jersey, and Hadassah University Hospital in Jerusalem, Israel, where he concentrates on the treatment of nerve injuries. At Hadassah Hospital, he has evaluated and treated over one hundred trauma victims, many of whom suffered gunshot and shrapnel wounds. (*See id.* ¶¶ 5–6.) Dr. Friedman has been qualified as an expert witness in several cases involving victims of terrorism, and this Court, as well, qualifies him as an expert capable of testifying about the effects of traumatic injuries involving gunshot wounds.

Dr. Friedman reviewed the forensic report of the pathologists who examined Aharon Ellis's body on January 18, 2002. The report indicates that Aharon was struck in the chest by two bullets, and in the left leg by another bullet. He also suffered an abrasion wound on his chest. (*See id.* ¶¶ 8–11.)

Dr. Friedman concluded that Aharon Ellis must have suffered severe pain as the result of his gunshot wounds. One of the chest wounds was large, nearly six inches in length, and penetrated into the chest cavity, all the way through to the lungs. Dr. Friedman had no doubt that "a wound of this size caused Mr. Ellis excruciating

pain." (*Id.* ¶ 16.) Moreover, the autopsy report noted that there were rib fragments visible through the wound. The bullet therefore shattered Aharon's ribs, resulting in increased pain. (*See id.* ¶ 17.) In addition, the autopsy report indicated that the smaller of the two chest wounds also penetrated the chest cavity, and almost certainly struck and shattered the sternum. This would have increased Aharon's pain considerably. (*See id.* ¶ 18.) Moreover, the bullet wound to Aharon's leg is believed to have struck either a bone or a major muscle group, which would have significantly increased Aharon's pain. (*See id.* ¶ 19.)

Based on the autopsy report and Angela Bangiew's description of Aharon before he died, Dr. Friedman holds the view that Aharon suffered asphyxiation during his last conscious minutes, causing excruciating pain. (*See id.* ¶ 21.) He concludes that Aharon's pleura and lungs were punctured, and that hemorrhaging resulted in blood filling the lungs. (*See id.* ¶¶ 22–23.) Death by asphyxiation is excruciating, because the victim has increased difficulty in breathing until he loses consciousness. (*See id.* ¶ 25.)

*Leslye Knox*

In 1996, Aharon began to live with Leslye Knox as husband and wife.[2] (*See* Hearing Transcript ("Tr.") at 6.) Aharon was ten years younger than Leslye, who was thirty-six years old at the time. Leslye had lived in Dimona since the age of eighteen, first with her parents and then with her previous husband, with whom she had five children. Leslye and Aharon had been friends before they began their relationship, and Aharon was a friend of Leslye's family. (*See id.* at 12.) On October 3, 2000, Aharon and Leslye had a child of

---

**2.** Leslye was recognized by a probate court in Israel as Aharon's common law spouse under the law of their domicile, thus making her a statutory heir.

their own, Jordan Terrell Ellis. Jordan and Leslye's other children are Plaintiffs in this action.

After Leslye and Aharon left the Dimona community, they lived together in Ra'anana. The transition was very difficult for Leslye, as she had never lived as an adult outside the AHI community, and she had limited facility in Hebrew. (*See id.* at 4.) As a result, Leslye became extremely dependent on Aharon, who was fluent in Hebrew and helped her adjust to life outside the AHI community. Aharon became her best friend; someone she could rely upon for emotional support. He helped her find a job, helped her open her first bank account, and helped her to learn how to dress outside the AHI community. (*See id.* at 14.) As Leslye testified, there was "a lot of love" between them. They were able to talk and to share things. (*Id.* at 12.) In her own words, "[i]t was just a beautiful relationship and friendship and just a lot of respect to be patient and understanding." (*Id.* at 3.)

Leslye worked five days per week, from noon to 9:00 or 10:00 p.m., as a cook in a private home. She left home at about 11:00 a.m., because she had an hour commute. She earned $1500 per month. (*See id.* at 17.) When she was at work, Aharon cared for all of the children. Aharon became the *de facto* father of Leslye's children—Reuven, Shanon, Sharyrah, Yoshavyah, and Amitai. They ranged in age from two years old to twelve years old. (*See id.*) Aharon contributed to their financial needs when Leslye was short of money.[3] He picked them up at school, helped them with their homework, took them to visit their father in Dimona, fed them, cared for them when they were ill, and counseled them. (*See id.* at 19–20.)

Aharon performed as a singer regularly, sometimes seven nights a week and twice in a day. He sang with two bands, as well as on his own. He earned $200 per show, and approximately $4,000–$4,500 per month. He had performed in Amsterdam, London, and Turkey, and produced several CDS and a music video that aired in Greece. (*See id.* at 8–10.) On their combined incomes, which they pooled (*see id.* at 21–22), Leslye and Aharon were able to maintain what Leslye considered to be a comfortable, middle-class lifestyle. (*See id.* at 26.)

Just three days before Aharon's murder, Leslye was diagnosed with cervical cancer. On the day Aharon was murdered, he and Leslye discussed the radical hysterectomy which Leslye was required to undergo. (*See id.* at 26–27.) She had the operation two weeks after Aharon's murder, and was hospitalized for seven days. (*See id.* at 29.) Aharon's death came during this extremely trying time for Leslye, when she was overwhelmed with concerns about her health, doctors' appointments, her prognosis, and surgery. She went through the days after his death mechanically, making whatever arrangements family members told her to make. (*See id.* at 29–30.)

With Aharon's death, Leslye's life was profoundly altered. She lost his physical, emotional, and financial support. She was left to care for six children on her own. The children were devastated by Aharon's death; some withdrew and others became angry and bitter. Two of the children were sent to live with Leslye's mother in the United States. (*See id.* at 33–34.) All of the children began to struggle in school, and several went for counseling. Leslye went for counseling twice a week, but continued to suffer anxiety attacks and depression. (*See id.* at 44–45.) She was lonely in Israel and was struggling finan-

---

3. Leslye's ex-husband provided $300 per month in child support. (*See id.* at 21.)

cially. (*See id.* at 47–48.) She was evicted from her apartment because her former husband had not been consistent in making child support payments.

After approximately one year, in March 2004, Leslye moved back to the United States. She now lives in Georgia with her six children. (*See id.* at 11.) Unfortunately, the move did not ease Leslye's burden. In the last four years, Leslye has lived in five different places. (*See id.* at 47.) She ran out of money and was evicted from her apartment on two occasions. She lived in a motel, and has been homeless. (*See id.* at 48–49.)

At the time of the hearing, Leslye was working as an assistant in a school cafeteria. She had recently moved into a new apartment and was earning just enough money to pay her rent, the utility bills, and for her family's necessities. (*See id.* at 50.)

Leslye dreams about Aharon several times a month. She dreams that he is still alive. (*See id.* at 45–46.) She still has anxiety attacks and suffers bouts of depression. (*See id.* at 46.) Leslye is troubled about leaving Israel. She feels that she cut herself off from honoring Aharon's memory. She cannot visit his grave or attend memorial services in Israel that are held for the victims of terrorism. (*See id.* at 51.)

*Jordan Terrell Ellis*

Jordan was fifteen months old when his father was murdered. He has no actual memory of his father, and knows of him through the stories he hears from his mother and siblings, and from the pictures he is shown. (*See id.* at 41–42.) Until shortly before the hearing, Leslye had not told Jordan that his father had died. Jordan thought he was living in Israel, and regularly asked for him. Jordan has been totally deprived of his father's emotional support, compassion, learning, guidance, and companionship. (*See id.* at 43–44.)

*Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavyah Carter, and Amitai Carter*

As discussed, Aharon became a surrogate father to Leslye's children. He lived with them and cared for them, and made no distinction in how he treated Leslye's children and his biological son Jordan. (*See id.* at 25.) Although Leslye's children had a good relationship with their biological father, he lived two hours away and might see them only once a month. (*See id.* at 21.) As Leslye testified,

[f]or a young man … at that time doesn't have any children, single young man and to take in a woman 10 years older than him that has five children, I think that explains it all about him going above and beyond…. Because we became united, he made a conscious decision to love me and be part of my world and that world came with my five children. Above and beyond is the washing, the cooking, the helping with the financial support and everything else…. That is why I say above and beyond. He loved them. It was genuine. It was from his heart…. He was just a good person.

(*Id.* at 23.)

Leslye testified that Aharon was quiet, good-hearted, patient, and responsible. He was an exemplary role model. (*See id.* at 25.) Because Aharon worked at night, and Leslye worked during the day, Aharon performed most of the household work. He cared for the children when they came home from school, bathed them, made them dinner, helped them with their homework, and put them to bed. He brought them to after-school activities, the park, on family trips, and to basketball and soccer practice. Because it was Aharon who was fluent in Hebrew, he was the parent who

spoke with the children's teachers and the principal of their school. (*See id.* at 19–20.) Aharon also educated the children in the customs of the AHI community.

Leslye's children looked to Aharon as a father. They were all traumatized by Aharon's death.

Shayrah is fifteen years old. She testified that Aharon was a father to her. She did not see her biological father very often. Aharon took her to school, shopping, and to shows. (*See id.* at 51–52.) They were able to speak Hebrew together. Aharon helped Shayrah with her homework. Shayrah talked to Aharon about wanting to be an attorney. That is no longer something she plans on. (*See id.* at 53.) He taught her to make pancakes and often spoke to her about his music. (*See id.* at 55.)

Shayrah could not accept Aharon's death and refused to go to his funeral. (*See id.* at 53–54.) She could not face the fact that he was really gone. (*See id.* at 54.) As her mother testified, Shayrah internalized all of her feelings about Aharon's death, and regressed in school. (*See id.* at 39.) When the subject of terrorist attacks would come up in school, she would have to leave the classroom. (*See id.* at 54.) Shayrah was angry at Aharon, believing that he chose to die by "taking a bullet" to protect Angela Bangiew. She used to dream of him every night, and still dreams of him two to three times a month. In her dreams, she sees Aharon being shot and she takes out the bullet and brings him back to life. (*See id.* at 56.) She thinks of him frequently, and feels that his death ruined her life. She feels that she lost a father and a friend, and that her way of life has changed drastically. (*See id.* at 56.)

Leslye testified that her son Reuven, who was fourteen when Aharon was killed, and is the eldest of her children, took Aharon's death the hardest. He was traumatized by the murder. He would draw graffiti on the wall of his room, depicting heaven and death. He would cry out in the middle of the night, saying that he wanted Aharon to come back. He became very angry and bitter. Reuven expressed hatred for the Arab world. He regressed in school, and Leslye felt it would be best for him to leave Israel. (*See id.* at 33–34.) He and another sibling went to live with his grandmother in Maryland. Leslye testified that four years later, Reuven is still bitter. His whole life has changed and he is just "trying to survive." (*Id.* at 35.) He was unable to testify at the hearing because he could not handle it emotionally. (*See id.* at 33–34.)

Shanon became bitter and angry. His entire outlook on life changed, and he was seen by a psychologist for a short period of time. He started to question God and became fatalistic, often speaking about death. He expressed hatred of Arabs. He became colder, and his grades in school declined. His teachers informed Leslye that he would frequently talk about guns and angels, and school officials were concerned about his behavior. Shanon attended counseling sessions for four or five weeks, but he did not want to open up and talk about his feelings. Leslye feels that he still needs counseling, as do her other children, but she cannot afford it. (*See id.* at 36–38.)

Yoshavyah, who is fourteen, refused to talk about Aharon's death and internalized his feelings. He never expressed anything about Aharon's death, started regressing in school, and just went "inward." (*Id.* at 40.)

Amitai, now eleven, is the youngest of Aharon's stepchildren and was the neediest. Aharon had the most contact with him. Aharon spent a year and half at

home with Amitai before he started pre-school, and took complete care of him during the day. (*See id.* at 41.) Amitai was hurt by Aharon's death, and was very vocal about it in school. He talked about it whenever he could, and asked a lot of questions. He misses Aharon, but is doing okay. (*See id.* at 41.)

*Prince Shaleak and Mellonee Ellis*

Aharon's father, Prince Shaleak, is a proud and dignified man. He is one of the founders of the AHI community in Dimona, Israel, and is one of nine princes who form the governing body of the community. (*See id.* at 57–58.)

Prince Shaleak and Mellonee Ellis are the parents of eight children.[4] Their family shared a two bedroom apartment in Dimona, and the physical closeness, as well as the mores of the community, contributed to very close personal relationships. (*See id.* at 60–61.) According to Prince Shaleak, Aharon, the first African Hebrew born in Israel (*see id.* at 59–60), was a dutiful, responsible son who, from an early age, assumed community responsibilities. As a child he worked at one of the communal stores, and made sure that his family had food and fresh vegetables for their Saturday evening communal meal. (*See id.* at 62–63.) He assumed the role of "provider." He was a member of the community choir and a youth leader. (*See id.* at 61–62.)

When he was twenty-one, Aharon moved out of the community. He would frequently visit and kept in close contact with his parents and siblings. (*See id.* at 63.) He would spend weekends and holidays at the commune, bringing his wife and children. The extended family would spend a lot of time together, singing and reminiscing. (*See id.* at 65.) Aharon's parents would

visit Aharon and his family, and on several occasions attended Aharon's performances.

Aharon and his father were close. They frequently discussed personal matters and, even after he left the community, Aharon would seek his father's advice. He asked his father how he should handle the responsibility of Leslye's children, and relied on his father's parenting advice. (*See id.* at 63–64.)

Prince Shaleak described the shock he felt on hearing of Aharon's murder. Initially, he was numb. (*See id.* at 67.) His hair fell out and he asked to be relieved of many of his duties in the community. (*See id.* at 68–69.) He described the tremendous turnout at Aharon's funeral, with people from all over Israel. (*See id.* at 68.) There are memorials to Aharon in Israel and Chicago, where there is an AHI community, and Aharon's father keeps a memorial plaque in his home. (*See id.* at 69–70.) He is still trying to come to terms with Aharon's death. (*See id.* at 71.)

Aharon's mother also described Aharon as a dutiful, responsible child. He worked and helped provide food for the family. (*See id.* at 72.) After he left the community, he would visit and stayed in close contact. Aharon and his mother would speak two or three times a week, and would often have lengthy telephone conversations, talking about their families and lives. (*See id.* at 73–74.)

On hearing of Aharon's murder, Mellonee Ellis's first reaction was disbelief. She had lost two other children, and Aharon was just thirty-one years old at the time of his death. She could not believe that Aharon had really died, and the fact of his death only became real when she saw Aharon's body at the burial. (*See id.* at 74.) Aharon's mother has experienced nightmares during the four years since

---

**4.** Two of their children, in addition to Aharon,     died.

Aharon's death, and both she and her husband have experienced difficulty in sleeping. She has received counseling and peer support in the community. (*See id.* at 75–76.) Francine Ellis, her daughter, testified that Mellonee grieves every day, but her father is even more emotional. They have both found it difficult to come to terms with Aharon's death. (*See id.* at 88–89.)

*Francine Ellis*

Francine is the oldest of the Ellis siblings. She was fourteen years older than Aharon, and helped raise him. (*See id.* at 80–81.) Francine and Aharon were very close. Aharon would call and visit whenever Francine was ill. (*See id.* at 83–84.)

Francine was devastated by Aharon's death, and could not attend his funeral. (*See id.* at 84–85.) Since Aharon's death, she has felt as if she is merely going through the motions of living. She has difficulty sleeping, and has continued to have the same dream about Aharon, in which he is mutilated but tells Francine that he is alive. (*See id.* at 85–86.) She is unable to ride on buses or be in large crowds, and is generally more apprehensive. (*See id.* at 87–87.) Francine misses her brother terribly and thinks of him often. (*See id.* at 86–87.) She described him as a "natural leader," as being "very gentle" and "very sensitive." (*Id.* at 87.) She has a picture of Aharon hanging in her room, and keeps his picture in her wallet. (*See id.* at 86.) Even four years after his death, Francine was unable to talk about Aharon without being overwhelmed by her emotions.

*Lynne Ellis*

Lynne Ellis was eleven years older than Aharon. As adults, they remained close. Aharon would call Lynn twice a week, checking up on how she was doing and whether she needed financial assistance. (*See id.* at 90.) She spent several weeks with him in the Fall of 2001. They spent most of their time talking and reminiscing about their growing up together. (*See id.* at 92.) Lynne is divorced and has two children. Aharon was a "special uncle" to her children, played ball with them, talked to them, and paid a lot of attention to them. Her children visited Aharon on weekends and spent summers with him. (*See id.* at 89–90.)

Lynne was devastated and depressed for a long time after Aharon's murder. She often thinks about him, and cannot sleep. (*See id.* at 91.) Her son reminds her of Aharon; he is quiet and a good person. (*See id.*) Lynne still has a hard time coming to grips with Aharon's death. She has attended many memorial services for Aharon, and visits his grave once a month. (*See id.* at 93–95.)

*Yihonadav Ellis*

Yihonadav Ellis is the youngest child in the family. Aharon was seven years older and served as a role model for Yihonadav. When their father was abroad, doing work for the community, Aharon filled in for him and acted as a surrogate father. Aharon signed Yihonadav up for a basketball team, took him to movies, and made sure that he had a healthy diet. Aharon helped him with his homework and, even after he left the community, Aharon took an interest in his education. (*See id.* at 96.) Yihonadav would visit Aharon at his home, stay over, and would attend his performances. (See id. at 97.) After the shows they would talk about their family and their community. They talked about their relationships and marriage. Aharon would provide advice about school and college. He encouraged Yihonadav to pursue his education and professional goals. (*See id.* at 98–99.)

Yihonadav spoke to Aharon on the day he was murdered. They made plans to meet that evening. Yihonadav decided,

instead, to spend the weekend with Aharon. (*See id.* at 100.) After Aharon's murder, Aharon was unable to continue in school. He was angry, and could not function or sleep at night. He saw a social worker on a few occasions, but found the therapy unsatisfactory. (*See id.* at 101.) Yihonadav never returned to school and he still is unable to function well when he thinks about his brother. He became a certified electrician. He has become an angry, colder, more distant person as a result of Aharon's murder. He has dreams in which Aharon tells him everything will be okay. (*See id.* at 102–03.) At times he has to leave his job because the memories of Aharon become so disturbing. (*See id.* at 103.) He used to visit Leslye and her children when they were still in Israel. (*See id.* at 103–04.) Yihonandav asks himself why Aharon had to be taken. As he testified,

> It is hard. It is hard to even think about or try to cope with everything that surrounds it. You are talking about many people. Many, many people. And he wasn't selfish. Very responsible person, caring. I just wish Jordan could have his father, but we know that has been taken from him by people who actually don't care and people who do things very . . . they intentionally go out to do certain things to people. . . .

(*Id.* at 104–05.)

*Tsaphrirah Ellis*

Tsaphrirah was three years younger than Aharon, with whom she was very close. She is a nutritionist. (*See id.* at 105.)

When they were children, she shared a bedroom with Aharon and sometimes slept in the same bed as him. Tsaphrirah described Aharon as "a father to everybody in the family." (*Id.* at 106.) As adults, they would visit each other frequently and would often speak on the telephone. She and her son spent a summer in Aharon's house. (*See id.* at 106–07.) Aharon was like a godfather to Tsaphrirah's son. He helped Tsaphrirah financially, buying clothes for her son and food for the family. (*See id.* at 106.)

Tsaphrirah spoke to Aharon the day before he died. When she first heard about his death she was devastated. For three months she had insomnia and could not sleep alone. She had nightmares, which she still experiences, and was terrified. (*See id.* at 108.) Tsaphrirah avoids the area where Aharon is buried and no longer goes out in public or in crowds. (*See id.* at 109–10.) It took her a long time to visit Aharon's home and his family, and she found it a very difficult experience because Aharon was not there. (*See id.* at 110.) Tsaphrirah thinks of Aharon often, and feels her pain has not lessened in the period since Aharon's death. (*See id.* at 110–11.) She has become engaged, and the prospect of her wedding without Aharon present troubles her deeply. (*See id.* at 109.)

*Shemariyah Elllis a/k/a Aron Carter* [5]

Aron Carter was less than two years older than his brother Aharon, and they had a very close relationship. They grew up with one another, sang together in a choir, shared a love of basketball, and had similar tastes in music. They shared friends as well. Aron encouraged Aharon to take singing seriously because he recognized he had a natural voice. (*See* Transcript of Deposition of Aron Carter, dated Nov. 2, 2005 ("Aron Dep. Tr."), Pls.' Ex. C, at 10, 13–14.)

---

**5.** Aron was unable to leave Israel and testified through a videotaped deposition.

After leaving the commune in Dimona, Aron lived on a kibbutz for a while, and Aharon lived nearby. They saw each other frequently. (*See id.* at 14–15.) After Aron left the kibbutz, he and Aharon would visit each other on weekends. Aron would travel to his brother's performances and, on occasion, would assist him professionally. (*See id.* at 16.) Aron worked in Ra'Anana for a period of time, and would frequently visit Aharon's home. (*See id.* at 17.) Their children spent a great deal of time together. (*See id.* at 18–20.) Even after Aron moved to the United States, he and Aharon would speak frequently. (*See id.* at 20.)

At the time of Aharon's death, Aron was living in Washington, D.C., apart from his family. Someone from the community called him at 2:00 a.m. to tell him of the murder. The news was devastating. Aron was unable to sleep or work consistently. (*See id.* at 21–22.) He sought help from a clinical social worker. (*See id.* at 22–23.) He still thinks about Aharon frequently, and misses Aharon's companionship. (*See id.* at 25.)

*Damages*

A. *Applicable Standards*

1. *Scope of Coverage*

The ATA created a federal cause of action for acts of international terrorism. It provides, in relevant part:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. 2333(a). By their default in this action, the well-pleaded allegations of the Complaint are established as true (see Complaint *passim*), and Defendants' liability under the ATA has been established as a matter of law. *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir.1995); *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 814 (2d Cir.1975). Thus, the sole issue that remains before the Court is the determination of damages. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir.1999); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Deshmukh v. Cook*, 630 F.Supp. 956, 959 (S.D.N.Y.1986) (when a defendant defaults, "the factual allegations of the complaint relating to liability are taken as true, but the allegations relating to the amount of damages are not").

The ATA does not define the terms "survivors" or "heirs," which are usually defined by state law. *See Ungar v. Palestinian Auth.*, 304 F.Supp.2d 232, 261 (D.R.I.2004). Leslye Knox and Jordan Ellis clearly qualify as Aharon's heirs. Jordan is Aharon's biological son. At the time of his murder in 2002, Aharon, a United States citizen, was domiciled in Israel. Aharon began living with Leslye and her children in August of 1996. Upon Aharon's death, the Israeli probate court recognized Leslye as Aharon's common-law spouse, and entered an inheritance order naming Leslye and Jordan as Aharon's heirs. (*See* Inheritance Order, dated Sept. 28, 2004, Pls.' Ex. F.) Moreover, "Israeli law provides that when a decedent dies intestate 'the legal heirs entitled to succession [are]: (1)[s]pouse of deceased; (2) children and their descendants and parents of deceased and their descendants.'" *Ungar*, 304 F.Supp.2d at 261 (quoting Martindale–Hubbell International Law Digest, Israeli Law Digest, Estates and

Trusts, Descent and Distribution, at 8).[6] Therefore, Leslye and her son Jordan qualify as heirs entitled to damages under § 2333. *Cf. Morris v. Khadr*, 415 F.Supp.2d 1323, 1337 (D.Utah 2006) (granting damages to victim's wife and children as "heirs" under § 2333); *Ungar*, 304 F.Supp.2d at 261 (holding that victim's biological sons were his "heirs" under § 2333).

■ Plaintiffs' also seek damages for Aharon's parents and adult siblings, as Aharon's surviving family members. In *Ungar*, the court undertook an exhaustive analysis of the scope of the term "survivor" as used § 2333(a). Looking at the legislative history of § 2333, the *Ungar* court concluded that "Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly." *Ungar*, 304 F. Supp 2d at 263. The court further noted that by "including the term 'survivors' in the class of persons eligible to bring an action, Congress evidenced an intention that family members who are not legal heirs (such as parents and a sibling of a decedent who leaves children) may bring an action pursuant to [§ 2333(a) ]." *Id.* The *Ungar* court concluded that, based on the legislative history of the ATA and the underlying purpose of the ATA to deter and punish acts of international terrorism, the term "survivors" as used in § 2333(a) includes parents and grown siblings of United States nationals killed by an act of international terrorism. *See id.* at 264–65.

This Court agrees that a victim's parents and adult siblings properly fall within the class of individuals that may claim damages under § 2333 as survivors. Therefore, Aharon's parents and siblings may advance claims for damages under § 2333. *Cf. Boim v. Quranic Literacy Inst.*, No. 00 C 2905, 2005 WL 433463, at *5 (N.D.Ill. Feb.18, 2005) (upholding jury award under § 2333 to parents of victim of terrorist attack); *Ungar*, 304 F. Supp 2d. at 275–76 (granting non-economic damages pursuant to § 2333 to parents and adult siblings of terrorism victim).

■ Plaintiffs also claim recovery for Leslye's five children from a previous marriage, who resided with Aharon and Leslye. These children are Aharon's common-law stepchildren. Although the basis for these children's claim to damages under § 2333 is not specifically alleged, presumably, they are also asserting their claims as "survivors," since they are not Aharon's legal heirs. There appear to be no cases addressing stepchildren's entitlement to damages as "survivors" under § 2333. However, courts that have interpreted federal maritime statutes, which also target wrongful death, have extended coverage to stepchildren. *See Spiller v. Thomas M. Lowe, Jr. and Assocs., Inc.*, 466 F.2d 903, 908 (8th Cir.1972) (holding that federal maritime law allows recovery for wrongful death by a stepchild); *Petition of the United States*, 418 F.2d 264, 271 (1st Cir.1969) (holding that stepchild was a "dependant relative" within the

---

6. Even if Israeli law was not controlling, and choice of law principles required the application of, for example, New York law, Leslye would still have a claim for damages as Aharon's common-law wife. New York courts recognize common-law marriage if valid where contracted, even though common-law marriage does not exist in New York state. *See Cross v. Cross*, 102 A.D.2d 638, 639, 476 N.Y.S.2d 876, 877 (1st Dep't 1984); *Langan v.*

*St. Vincent Hosp.*, 196 Misc.2d 440, 765 N.Y.S.2d 411, 414 (N.Y.Sup.Ct.2003), *rev'd on other grounds*, 25 A.D.3d 90, 802 N.Y.S.2d 476 (2d Dep't 2005). New York courts have specifically recognized the status of a plaintiff as a common law spouse of a decedent for the purposes of a wrongful death cause of action. *See Black v. Moody*, 276 A.D.2d 303, 304, 714 N.Y.S.2d 30, 31 (1st Dep't 2000).

meaning of the Death on the High Seas Act); *Stissi v. Interstate and Ocean Transp. Co.*, 590 F.Supp. 1043, 1046 (E.D.N.Y.1984), *rev'd in part on other grounds*, 765 F.2d 370 (2d Cir.1985) (same).[7] For example, in *Stissi*, Judge Nickerson, in the Eastern District of New York, considered whether stepchildren were entitled to damages as "dependents" under the Death on the High Seas Act. The court looked at the following factors in making its determination: "the relationship of parent to child, continuous living together, harmonious family relationships, participation of the deceased in family services and his disposition and habit to tender aid, solace and comfort when required." *Stissi*, 590 F.Supp. at 1046 (citing *Thompson v. Offshore Co.*, 440 F.Supp. 752, 764–65 (S.D.Tex.1977)). Although the court in *Stissi* was evaluating whether a decedent's stepchildren qualified as "dependent relatives," these factors are equally applicable in assessing whether Aharon's stepchildren fall within the scope of "survivors" as used in § 2333(a).

All of the *Stissi* factors are present in Aharon's relationship with Leslye's children. The children resided with Aharon and Leslye from 1996 through Aharon's death in 2002. Aharon acted as a *de facto* father to his stepchildren, making no distinction in their treatment and the treatment of Jordan, his biological son. He was the primary father figure in his step-children's lives. Aharon had close daily interaction with all of his stepchildren, performing much of the domestic work in their home and caring for the children while Leslye worked. Aharon was an attentive stepfather, helping his stepchildren with their homework, attending school activities, taking them to basketball and soccer practice, and interacting with the children's teachers and principal, as Leslye was not fluent in Hebrew. Aharon was also charged with his stepchildren's religious instruction, and educated them in the customs of the AHI community. Finally, Aharon provided financial support for his stepchildren.

It is apparent that Leslye's children were both financially and emotionally dependent upon Aharon. Based upon the broad remedial purpose of section 2333, and the close, dependent relationship Leslye's children had with Aharon, the Court concludes that they are "survivors" who are entitled to compensatory damages for Aharon's murder. *Cf. Berger*, 82 Mich. App. at 210 n. 17, 267 N.W.2d at 129 n. 17 (citation omitted) ("Non-biological parents may, and often do, serve the identical needs of a child"). "Whether [ ] a loss is suffered [by reason of a death] has nothing to do with whether the relationship is one of blood or affinity." *Petition of the United States*, 418 F.2d at 271. *Cf. Smith v. Islamic Emirate of Afghanistan*, 262

---

7. Numerous state courts have also allowed stepchildren to recover non-economic damages upon the injury or death of a stepparent. *See e.g., Higgins v. Intex Recreation Corp.*, 123 Wash.App. 821, 840, 99 P.3d 421, 430 (Wash. Ct.App.2004) (recognizing a claim by a stepchild for loss of parental consortium); *Berger v. Weber*, 82 Mich.App. 199, 210, 267 N.W.2d 124, 129 (Mich.Ct.App.1978) (commenting that loss of parental society and companionship damages may be sought for the loss of those in a parental role to a child, not only natural parents); *Moon Distribs., Inc. v.* *White*, 245 Ark. 627, 633–34, 434 S.W.2d 56, 59 (Ark.1968) (holding that stepchild, who lived in same house as stepmother and for whom stepmother acted *in loco parentis*, was entitled to recover pecuniary and mental anguish damages for wrongful death of stepmother); *see also Gonzalez v. New York City Housing Auth.*, 77 N.Y.2d 663, 668–69, 569 N.Y.S.2d 915, 918, 572 N.E.2d 598 (1991) (allowing adult grandchildren raised by grandmother to recover for wrongful death of grandmother).

F.Supp.2d 217, 237 (S.D.N.Y.2003) (awarding solatium damages to a maternal grandmother who was the primary figure in raising a terrorism victim, and to a stepsibling who had been raised with the decedent and shared a bedroom with him for four years).[8]

## 2. *Measure of Damages*

■ Plaintiffs seek both economic and non-economic damages. Specifically, Aharon's Estate seeks Aharon's lost future earnings, and damages for his pain and suffering. The remaining Plaintiffs seek a range of non-economic damages, including loss of consortium, loss of companionship, society and guidance, and damages for mental anguish ("solatium damages"). Plaintiffs are also seeking the statutorily mandated treble damages.

Section 2333(a) is unclear as to the nature of damages that may be recovered by a covered plaintiff. However, several cases have considered the scope of the damages available under § 2333(a), and have concluded that the deterrent purpose of the ATA is maximized if it is interpreted to subject terrorists to the broadest range of economic damages. *See Ungar*, 304 F.Supp.2d at 267. Thus, § 2333(a) has been interpreted as entitling plaintiffs to a full range of economic and non-economic pecuniary damages. *See Morris*, 415 F.Supp.2d at 1337 (holding that victim's family may recover under § 2333 for the victim's lost wages and pain and suffering, and for the victim's wife and children's loss of companionship, society, and guidance,

and mental anguish); *Ungar*, 304 F. Supp 2d at 267 (holding plaintiffs entitled under § 2333 to economic and non-economic damages, including loss of companionship and society, and mental anguish experienced by the victim's surviving family members). This Court agrees that the full range of damages should be available to persons entitled to bring actions under the ATA. As observed in the *Ungar* case, "Senator Grassley, the bill's co-sponsor, indicated that 'it empowers victims with all the weapons available in civil litigation.'" *Ungar*, 304 F.Supp.2d at 265 (quoting *Antiterrorism Act of 1990: Hearing before the Subconm. On Intellectual Prop. & Judical Admin. Of the House Comm. On the Judiciary*, 102nd Congress 10 (1992)); *see also Boim v. Quranic Literacy Inst. and Holy Land Found. For Relief and Dev.*, 291 F.3d 1000, 1010 (7th Cir.2002) ("That [legislative] history, in combination with the language of the statute itself, evidences an intent to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law.").

In interpreting the Flatow Amendment to the Federal Sovereign Immunities Act, 28 U.S.C. § 1605, which provides for causes of action by the victims of international terrorism against the agents of foreign states designated as state sponsors of terrorism, *see Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C.Cir.2002); *Smith*, 262 F.Supp.2d at 226, and which specifically provides for solatium damages, Judge Baer, of this

---

**8.** The *Islamic Emirate* case offers additional persuasive support for including stepchildren within the scope of survivors covered by § 2333(a). In *Islamic Emirate,* the court awarded solatium damages to, *inter alia,* a maternal grandmother who raised the victim. Noting that the court was unable to find any precedent where a grandparent has been awarded such damages, the court found that

it was clear that the grandmother had acted as the victim's surrogate mother and that the two had developed an extremely close bond. *See id.* By contrast, the court concluded that adult siblings and step-siblings, with whom the victim did not grow up, were not entitled to solatium damages, because they lacked a close relationship to the victim. *See id.* at 236–37.

Court, considered the following factors in computing such a damages award:

> (1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e.closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death.

*Smith*, 262 F.Supp.2d at 234 (citing *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 90 (D.D.C.2002)). He applied these factors in awarding solatium damages under the ATA as well as the Flatow Amendment. "Spouses and relative in direct lineal relationships are presumed to suffer damages for mental anguish. The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium." *Smith*, 262 F.Supp.2d at 234 (quoting *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 29–30 (D.D.C.1998)).

## II. *Application to Plaintiffs' Claims*

### A. *Aharon Ellis's Estate's Claims*

#### 1. *Economic Loss*

■ Aharon's Estate is entitled to compensation for the economic losses caused by Aharon's murder. *See, e.g., Ungar*, 304 F.Supp.2d at 232. Dr. Avi Weiss, Chairman of the Department of Economics at Bar–Ilan University in Israel, submitted a report analyzing the present-day value of the income that Aharon will never earn as a result of his murder. (*See* Estimation of Economic Losses Due to Death of Aharon Ellis, Oct. 2005 ("Weiss Rept."), Pls.' Ex. I.) [9]

Based upon the evidence that Aharon had steady employment as a singer, working on average five nights per week and earning $200 per performance, Dr. Weiss concluded that Aharon was earning an annual income of approximately $52,000.[10] Dr. Weiss assumed, rather conservatively, that Aharon would not have developed other sources of income from, for example, recordings, international performances, and teaching. At the time of his death, Aharon had already had ventures in the first two of these categories. The only increase in income Dr. Weiss factored in was a 1.3% annual growth in income, which corresponds to the ten-year average growth in average wages in Israel. (*See id.* at 5.) Applying Israeli life expectancy tables, Dr. Weiss assumed that Aharon would have lived another 47.2 years, until the age of 78.2, and that he would have retired at the age of 67, the standard retirement age in Israel. Thus, Dr. Weiss assumed that Aharon would have received old-age benefits for 11.2 years after he retired. (*See id.* at 4.) Dr. Weiss then employed a standard method for discounting future income, applying a 2.24% discount rate, which reflects the rate paid on ten-year Israeli bonds, minus the tax rate on such income. (*See id.* at 5.) Dr. Weiss concluded that the Estate's loss of income,

---

9. Dr. Weiss received a Ph.D. in economics from the University of Chicago in 1987. He has taught economics since 1988, has authored many publications, has served as a referee for journals and various institutions, and has been the recipient of numerous grants. (*See* Curriculum Vitae of Dr. Avi Weiss, attached as an exhibit to Weiss Rept.)

10. Dr. Weiss assumed that there were periods when Aharon performed less frequently, but others when he performed several times per day. As discussed, Leslye testified there were weeks when Aharon performed every day, and several times per day.

in U.S. dollars, discounted to present value, is $971,876. Dr. Weiss further discounted this amount to reflect Aharon's personal maintenance expenditures over the course of his life, resulting in a net of future after-tax income of $746,886.71. (*See id.* at 6–7.)

The Court finds the assumptions and methodology of Dr. Weiss to be sound and recommends that the Estate of Aharon Ellis be awarded damages for lost future income in the amount of $746,886.71.

### 2. *Pain and Suffering*

■ The Estate of Aharon Ellis is also entitled to damages for the pain and suffering Aharon endured before dying. *See, e.g., Morris,* 415 F.Supp.2d at 1337 (awarding estate $10 million for pain and suffering of deceased, and then trebling the award); *Ungar,* 304 F.Supp.2d at 268–70 (awarding $500,000 for pain and suffering to estate of deceased, and then trebling the award); *Smith,* 262 F.Supp.2d at 234 (awarding $1 million for pain and suffering to deceased's estate, and then trebling the award); .

Plaintiffs seek an award of $1 million for Aharon's pain and suffering. The Court finds this request reasonable. As the testimony indicated, Aharon was conscious and in great pain for at least a full minute before losing consciousness. Dr. Friedman found that Aharon suffered two bullet wounds to the chest and a bullet wound to his leg. Aharon's ribs were shattered and it is likely that he asphyxiated as a result of a pulmonary hemorrhage, which filled his lungs with blood. Death in this manner is excruciating. Accordingly, the Court recommends an award of $1 million to Aharon's estate for his pain and suffering.

### B. *Claims of Aharon Ellis's Common-law Wife—Leslie Knox*

■ Leslye Knox seeks $10 million for loss of consortium and mental anguish. The Court finds this amount to be an appropriate award. It is apparent that Leslye has suffered enormous emotional and financial upheaval as a result of Aharon's death, which came at a time when she was already burdened with dealing with her cervical cancer. Leslye lost a companion and friend, with whom she had built a comfortable, emotionally rich and secure life. Leslye was left to raise six children on her own. Her financial stability and plans for her future were destroyed. She was forced to leave her home, disrupted her children's education, and moved from Israel to the United States. She experienced homelessness and repeated relocations. Under the circumstances, an award of $10 million is just and reasonable. *Compare Morris,* 415 F.Supp.2d at 1337 (awarding wife and children of terrorism victim $20 million in solatium damages); *Smith,* 262 F.Supp.2d at 239 (awarding wife of terrorism victim $10 million in solatium damages); *Higgins v. Islamic Republic of Iran,* No. 1:99CV00377, 2000 WL 33674311, at *8 (D.D.C. Sept.21, 2000) ($12 million award to spouse of husband taken hostage in Iran and subsequently executed); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62 (D.D.C.1998) ($10 million award to spouse of husband taken hostage in Iran for several years); *Alejandre v. Republic of Cuba,* 996 F.Supp. 1239 (S.D.Fla.1997) ($8 million award to spouse of deceased husband shot down in airplane by government of Cuba).

### C. *Claims of Aharon Ellis's Biological Son—Jordan Ellis*

■ Plaintiffs seek $10 million in damages for the loss of companionship and

mental anguish Jordan Ellis has suffered as a result of the loss of his father.

Jordan was less than two years old when his father was murdered. His only memory of his father is through pictures and family stories. He will never have the benefit of his father's companionship and guidance, truly an enormous loss. However, the Court can only speculate as to the long-term consequences Jordan will suffer as a result of the loss of his father. Taking into account the fact that Jordan was too young to consciously experience the trauma of his father's murder, and did not even know that he was not alive until recently, the Court concludes that an award of $5 million is reasonable and commensurate with awards in similar cases. *See Ungar,* 304 F.Supp.2d at 273–74 (awarding each of two children of terrorist victim $10 million, noting that children lost their mother at the same time they lost their father, and there was psychiatric evidence that the loss caused "psychic trauma"); *Smith,* 262 F.Supp.2d at 239 (awarding each child of terrorist victim $3 million); *Kerr v. Islamic Republic of Iran,* 245 F.Supp.2d 59, 64 (D.D.C.2003) (awarding $3 million to each adult child whose father was shot in the back of the head by terrorists); *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 23 (D.D.C.2002) (awarding $5 million to each adult child of a terrorism victim); *Higgins,* 2000 WL 33674311, at *9 (awarding $12 million to adolescent child of victim who was kidnapped, tortured, and killed).

D. *Claims of Aharon Ellis's Common-law Stepchildren—Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavyah Carter, and Amitai Carter*

■ It is apparent that Aharon's stepchildren were traumatized by Aharon's murder. He cared for them as he did for his biological son, and his loss left an enormous void in their lives. Accordingly, the Court recommends that Reuven, Shanon, Shayrah, Yoshavyah, and Amitai Carter each be awarded $5 million in solatium damages.

E. *Claims of Aharon Ellis's Parents— Prince Shaleak and Mellonee Ellis*

■ Aharon and his parents had an extremely close relationship. He was at the center of their lives, and had been a role model in their close-knit community. He would, no doubt, have been a great support to them in their senior years. His loss caused them enormous grief. They each seek $5 million in damages for loss of companionship and mental anguish caused by the loss of their son. This amount is reasonable. *See Ungar,* 304 F.Supp.2d at 274–75 (awarding each parent of terrorist victim $5 million); *Smith,* 262 F.Supp.2d at 239 ($3 million to father of terrorist victim); *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1, 9 (D.D.C.2000) ($5 million to each surviving parent of bombing victims); *Flatow,* 999 F.Supp. at 32 ($5 million to each parent of terrorist victim).

F. *Claims of Aharon Ellis's Siblings— Francine Ellis, Lynne Ellis, Yihonadav Ellis, Tsaphrirah Ellis, and Aron Carter*

■ Aharon and his siblings had extremely close relationships. Aharon was adored and respected by his brothers and sisters, and their deep sense of loss has not eased. They each seek $2.5 million in solatium damages, an amount which the Court finds reasonable. *See Ungar,* 304 F.Supp.2d at 276 (awarding each sibling of terrorist victim $2.5 million); *Smith,* 262 F.Supp.2d at 239–40 (awarding solatium damages of $2 million to each sibling of terrorist victim); *Kerr,* 245 F.Supp.2d at 64 (awarding $1.5 million to sisters of ter-

rorist victim); *Eisenfeld,* 172 F.Supp.2d at 9 ($2.5 million award to each sibling of terrorist victims); *Flatow,* 999 F.Supp. at 32 (awarding siblings $2.5 million).

\* \* \* \* \* \*

As statutorily mandated under section 2333, each of the awards set forth above should be trebled.

## CONCLUSION

For the reasons set forth above, this Court recommends that a judgment be entered against Defendants Palestine Liberation Organization and the Palestine Authority in the following amounts:

*The Estate of Aharon Ellis*

For lost future earnings—$2,240,660.13

For Aharon's pain and suffering—$3 million

*Leslye Knox*

For loss of consortium and mental anguish—$30 million

*Jordan Terrell Ellis*

For loss of companionship and mental anguish—$15 million

*Reuven Carter*

For loss of companionship and mental anguish—$15 million

*Shanon Carter*

For loss of companionship and mental anguish—$15 million

*Shayrah Carter*

For loss of companionship and mental anguish—$15 million

*Yoshavyah Carter*

For loss of companionship and mental anguish—$15 million

*Amitai Carter*

For loss of companionship and mental anguish—$15 million

*Prince Shaleak*

For loss of companionship and mental anguish—$15 million

*Mellonee Ellis*

For loss of companionship and mental anguish—$15 million

*Francine Ellis*

For loss of companionship and mental anguish—$7.5 million

*Lynne Ellis*

For loss of companionship and mental anguish—$7.5 million

*Yihonadav Ellis*

For loss of companionship and mental anguish—$7.5 million

*Tsaphrirah Ellis*

For loss of companionship and mental anguish—$7.5 million

*Aron Carter*

For loss of companionship and mental anguish—$7.5 million

**Total Award—$174,740.660.13**

Pursuant to 28 U.S.C. 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and 6(e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Victor Marrero, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Marrero. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 149–52, 106 S.Ct. 466, 472–3, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992);

82

*Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam).